44 A.3d 1100

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ALNESHA MINITEE, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. DARNELL BLAND, DEFENDANT–RESPONDENT.

Argued January 17, 2012—Decided June 14, 2012.

Albin, J., dissented and filed opinion.

*Joie D. Piderit,* Assistant Prosecutor, argued the cause for appellant in State v. Alnesha Minitee (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for appellant in State v. Darnell Bland (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for respondent Darnell Bland (*Joseph E. Krakora,* Public Defender, attorney).

*Michael J. Confusione,* Designated Counsel, argued the cause for respondent Alnesha Minitee (*Joseph E. Krakora,* Public Defender, attorney).

*Peter J. Gallagher* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Porzio, Bromberg & Newman,* attorneys).

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

Following the trial court's denial of defendants' motion to suppress, defendant Bland entered a negotiated plea of guilty to one count of first-degree robbery, *N.J.S.A.* 2C:15–1. Defendant Minitee elected to proceed to trial and was convicted of five counts of first-degree robbery, *N.J.S.A.* 2C:15–1. Defendants appealed, and the Appellate Division concluded that the trial court erred when it denied defendants' suppression motion and, as a result, vacated defendants' convictions. *State v. Minitee,* 415 *N.J.Super.* 475, 478, 2 *A.*3d 447 (App.Div.2010). We granted both the State's petition for certification, 205 *N.J.* 81, 12 *A.*3d 213 (2011), and the

motion of the Association of Criminal Defense Lawyers of New Jersey ("Association") to appear as amicus curiae. Because we are satisfied that the Appellate Division erred in its analysis and conclusion, we reverse and reinstate defendants' convictions.

I.

Defendants were charged with a series of robberies that took place in Middlesex, Essex, and Bergen Counties. Defendant Minitee was apprehended almost immediately after the Bergen County incident, while defendant Bland was arrested several months later when one of the victims of the Bergen County crime identified his picture in a photo array. When Minitee was arrested, she was standing next to a red SUV that the police had followed from the robbery scene. The search of that vehicle produced evidence linking the parties to the series of robberies. Defendants Bland and Minitee both moved to suppress the results of that search but were unsuccessful. At the trial of defendant Minitee, which led to her conviction, the State introduced evidence that was obtained during the search of the SUV.

We thus turn to the facts surrounding Minitee's arrest and the subsequent search of the SUV. Shortly after 10:30 p.m. on the evening of January 24, 2003, Police Officer Alejandro Lorenzo of the Fort Lee Police Department heard on his police radio that an armed robbery was in progress at KOA Spa, which was located right around the corner from where he was having a meal break. He rushed to the scene and found a group of people standing outside, several of whom pointed out a red SUV stopped in traffic at a light. They yelled out to Lorenzo that the occupants of the SUV were armed and had "just robbed the place." The driver of the SUV was trying to squeeze the vehicle around the surrounding traffic; Lorenzo drew his weapon and ordered the occupants in the SUV to get out. After repeating his order several times, one man, later identified as defendant Bland, got out of a rear door of the vehicle, holding a purse and a gun. Officer Lorenzo ordered him to drop both, and he did so; Lorenzo then ordered him to get

on his knees on the sidewalk. Bland moved as if to comply and then fled on foot.

Lorenzo made no attempt to follow Bland but continued his focus on the SUV. He repeated his order to get out to those remaining in the SUV, but the traffic light turned green and the vehicle began to drive away. Lorenzo ran after it a short distance and then radioed in to dispatch the route that the SUV was taking as well as the direction in which Bland had run.

Other members of the Fort Lee Police Department, including Police Officer Michael Gerardo, heard Lorenzo's broadcast. Gerardo spotted the SUV and followed it. Gerardo did not turn on his lights and siren because he did not want to alert the driver to his presence. The route the SUV took led to Beverly Hills Road, which was a dead-end street. When Gerardo arrived at the stopped SUV, Minitee and Liakesha Jones were standing next to the vehicle. The women told Gerardo they were the victims of a carjacking. Gerardo nonetheless ordered them to lay on the ground, and he waited for backup officers, who arrived shortly thereafter. Minitee told the police that they had been carjacked by two black males who had fled on foot when the car reached the end of the dead-end street.

The driver's-side door of the SUV was open, and one of the backup officers who had arrived on the scene, Detective Howard Ginsburg, looked into the vehicle. He saw, in plain view, two rolls of duct tape on the rear passenger seat and floor. The officers at the scene knew from radio transmissions that the victims of the robbery had been tied up with duct tape. From a motor vehicle check, the officers learned that Minitee was the registered owner of the SUV. Based on Ginsburg's observation of the duct tape and Gerardo's tracking of the SUV from the immediate vicinity of the robbery, the police took Minitee and Jones to police headquarters for questioning and arranged for the SUV to be towed to that location as well.

The record is unclear as to the exact times Minitee, Jones, and the SUV arrived at police headquarters. It is clear, however, that

they did not arrive simultaneously. The police had to call an independent tow company to tow the SUV to police headquarters and, when Minitee and Jones were taken to police headquarters, another officer was left with the SUV to await the arrival of the tow truck. When the vehicle ultimately arrived at police headquarters, it was not immediately searched but, rather, was placed in a secure sally port for safekeeping.

After some period of time, the exact length of which cannot be determined from the record before us, members of the Bergen County Sheriff's Office assigned to its Bureau of Criminal Investigation ("Bureau") arrived at headquarters and searched the SUV. The search of the vehicle turned up the following items: pages of classified ads from The Star Ledger for massage parlors in the area, the names of which had been marked with either an asterisk, a "no" or "next"; four rolls of duct tape and one roll of electrical tape; a videotape of a robbery of a massage parlor in East Brunswick; a brown and white wool hat; a black skull cap; a black wool visor; a black ski mask; a checkbook in the name of Anthony Herns; a cell phone; and a piece of paper with handwritten directions.

Although the record does not indicate the exact time the SUV was searched, there was testimony at the suppression hearing that the members of the Bureau did not finish processing the crime scene at the spa until shortly before 2:00 a.m. There was also testimony that there were multiple pursuits in progress during the interim, including one involving a K-9 unit, as police searched for the men who had fled on foot. One of the men, Almustafa Baldwin, was found some two miles away in another municipality; defendant Bland, as we noted earlier, was not apprehended until months later.

Detective Ginsburg testified at the suppression hearing that when Baldwin was being processed at police headquarters, he told the officers that he had discarded a gun after the robbery. Baldwin volunteered to show them where he had tossed it. After being placed in a police car to go retrieve the weapon, Baldwin

changed his mind and said that he would not take the officers to the site. Ginsburg testified that at that point, most of the members of the Fort Lee Police Department were deployed to search for the weapon; he testified that they were joined in their efforts by police from a neighboring municipality, as well as by members of the Port Authority Police Department. They searched through the night with no luck. The next morning, a resident of Beverly Hills Road called the police to report that he had discovered a gun next to his garbage can.

Testimony revealed that in fact there were several sites the Bureau needed to process in those early morning hours: the spa; the site where the gun and purse had been discarded by defendant Bland; the site where a jacket discarded by one of the fleeing robbers had been discovered; and the site where the SUV had come to a halt.

The police had not obtained a warrant prior to undertaking the search of the SUV. The trial court, satisfied that there was a confluence of probable cause and exigency, found no basis to suppress the products of the search. The Appellate Division, on the other hand, considering the situation governed by *State v. Pena–Flores*, 198 *N.J.* 6, 965 *A.*2d 114 (2009), reversed.

## II.

Before this Court, the State presents distinct arguments with respect to defendant Minitee and defendant Bland. As to defendant Minitee, the State argues that the Appellate Division was incorrect when it deemed this matter to be controlled by *Pena–Flores*. It contends that, instead, this matter is analogous to *State v. Martin*, 87 *N.J.* 561, 436 *A.*2d 96 (1981), a case in which this Court upheld the warrantless search of a vehicle believed to be tied to a robbery. The State contends that the police acted in an entirely reasonable manner when they did not immediately search the SUV where it came to a halt but instead had it towed to headquarters. The State stresses the ongoing and fluid nature of the situation that confronted the police and argues that the

Appellate Division should not have taken this Court's reference in *Pena–Flores*, to obtaining a telephonic search warrant, as a standard by which to measure police conduct that occurred some six years before this Court decided *Pena–Flores*.

With respect to defendant Bland, the State stresses that the police were dealing with exigent circumstances. The State argues that even if the police had been able to apply telephonically for a search warrant in 2003, exigent circumstances would be required. In its view, because exigent circumstances existed, the warrantless search in 2003 was permissible. The State also argues that Bland, as a passenger in the SUV, lacked standing to challenge the search of the SUV; it contends that he did not have the requisite proprietary or participatory interest in the vehicle or the items seized. In addition, the State argues that this Court set down a new rule of law in *Pena–Flores* and that the rules we articulated in that case should not be applied retroactively to this matter.

Defendant Minitee, on the other hand, argues that the Appellate Division correctly held that her motion to suppress should have been granted. She contends that the search of the SUV cannot be upheld as a search incident to arrest and that it does not fit within the automobile exception to the warrant requirement. According to Minitee, whatever exigency may have existed when the police first came upon the SUV at the end of the dead-end road had evaporated by the time the vehicle was searched at police headquarters.

Defendant Bland argues that no exigency existed at the time that the vehicle was searched and thus that the failure on the part of the police to secure a warrant prior to the search required that his motion to suppress be granted. Defendant Bland contends that there is no incongruity between *Martin* and *Pena–Flores*; he urges that the situation confronting the Fort Lee police was not comparable to that presented in *Martin* and that *Martin* provides no basis to uphold the warrantless search that took place here. Finally, he stresses this State's traditionally generous view of standing when analyzing motions to suppress and asserts that he

had the requisite participatory interest in the SUV and its contents. *See State v. Mollica*, 114 *N.J.* 329, 339, 554 *A.*2d 1315 (1989) (noting New Jersey "applies a broad standard" to questions of standing).

Amicus Association argues that the Appellate Division correctly held the search of the SUV was impermissible. It stresses the policy considerations underlying the automobile exception to the warrant requirement and contends that those policy considerations do not permit the removal of a vehicle from the scene and a subsequent warrantless search in the security of a police lot.

### III.

We note at the outset the standard governing our review of this matter. As an appellate court, we do not make independent findings of fact. *State v. Locurto*, 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999). Rather, we " 'must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record.' " *State v. Robinson*, 200 *N.J.* 1, 15, 974 *A.*2d 1057 (2009) (quoting *State v. Elders*, 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007)). More than fifty years ago, this Court succinctly stated the governing principles: if a reviewing court is satisfied that a trial court could reasonably have reached its findings on sufficient credible evidence in the record, "its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal." *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). This Court has not retreated from those principles but, rather, has continued to restate them. *See, e.g., State v. Handy*, 206 *N.J.* 39, 44–45, 18 *A.*3d 179 (2011); *Elders, supra,* 192 *N.J.* at 243–45, 927 *A.*2d 1250. On the other hand, "a reviewing court owes no deference to the trial court in deciding matters of law." *State v. Mann*, 203 *N.J.* 328, 337, 2 *A.*3d 379 (2010) (citing *State v. Gandhi*, 201 *N.J.* 161, 176, 989 *A.*2d 256 (2010)).

██ We note also the fundamental principles that must guide the analysis of any motion seeking to suppress evidence. Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures. *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. So important is the requirement that the police obtain a warrant before proceeding to conduct a search that a search conducted without a warrant is presumed to be invalid. *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000) (citing *State v. Alston,* 88 *N.J.* 211, 230, 440 *A.*2d 1311 (1981)). There are certain exceptions to the general requirement that a warrant be obtained prior to a search, but if a warrantless search is challenged, the State bears the burden of establishing by a preponderance of the credible evidence that the search fits within the scope of one of those exceptions. *State v. Wilson,* 178 *N.J.* 7, 12–13, 833 *A.*2d 1087 (2003); *Cooke, supra,* 163 *N.J.* at 664, 751 *A.*2d 92.

██ Of those several exceptions to the warrant requirement, only two are pertinent to this matter—the search incident to arrest exception and the automobile exception. When the police place an individual under arrest, they may search his person and the area within his immediate grasp. *Chimel v. California,* 395 *U.S.* 752, 762–63, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685, 694 (1969). Even in the automobile context, New Jersey restricts the scope of such a search to the area from which an individual may seize a weapon or destroy evidence. *State v. Eckel,* 185 *N.J.* 523, 541, 888 *A.*2d 1266 (2006); *State v. Dunlap,* 185 *N.J.* 543, 548–49, 888 *A.*2d 1278 (2006) ("[T]he search incident to arrest exception cannot be invoked where a defendant has no capacity to reach the interior of the vehicle to destroy evidence or to endanger the police.").

██ Based upon the narrow scope with which we have interpreted the search incident to arrest exception, we agree with defendant Minitee that this search cannot be sustained as one incident to her arrest. Both its timing and its situs preclude characterizing this search as incident to the arrest of Minitee and Jones.

This search can only withstand defendants' challenge if its circumstances bring it within the scope of the automobile exception. Our review of this record convinces us that the search of the SUV does fit within the scope of the automobile exception and that, accordingly, the trial court was correct when it denied defendants' motion to suppress.

New Jersey jurisprudence does not follow the route laid down by the federal courts with respect to the automobile exception. Under federal constitutional principles, police may conduct a warrantless search of an automobile under the automobile exception "so long as the vehicle is readily mobile and there is probable cause to believe it contains evidence of criminality." *Pena–Flores, supra,* 198 *N.J.* at 20, 965 *A.2d* 114 (citing *Pennsylvania v. Labron,* 518 *U.S.* 938, 940, 116 *S.Ct.* 2485, 2487, 135 *L.Ed.*2d 1031, 1036 (1996)). Under federal constitutional principles, there is no separate requirement that exigent circumstances exist before the police may proceed under the automobile exception to search a motor vehicle. *Maryland v. Dyson,* 527 *U.S.* 465, 466, 119 *S.Ct.* 2013, 2014, 144 *L.Ed.*2d 442, 445 (1999).

Our divergence from federal analysis in this area springs from this Court's recognition that our State Constitution "afford[s] [our] citizens greater protections than those afforded by its federal counterpart." *Cooke, supra,* 163 *N.J.* at 666, 751 *A.2d* 92; *accord Eckel, supra,* 185 *N.J.* at 538, 888 *A.2d* 1266 ("[W]e have not hesitated in the past to afford our citizens greater protection against unreasonable searches and seizures under Article I, Paragraph 7 than would be the case under its federal counterpart."); *State v. Hempele,* 120 *N.J.* 182, 196, 576 *A.2d* 793 (1990) ("When the United States Constitution affords our citizens less protection than does the New Jersey Constitution, we have not merely the authority to give full effect to the State protection, we have the duty to do so.").

Rather than embracing the federal construct of the automobile exception, we have adhered to the principle that the presence of exigent circumstances is an essential element of the automobile

exception to the warrant requirement. *Pena–Flores, supra,* 198 *N.J.* at 28, 965 *A.*2d 114 (noting three elements to the automobile exception: an unexpected stop, probable cause, and "exigent circumstances ... under which it is impracticable to obtain a warrant").

In *Pena–Flores* and *Cooke,* we traced the development of the automobile exception, both under federal constitutional principles and under our own constitution. *Pena–Flores, supra,* 198 *N.J.* at 20–28, 965 *A.*2d 114; *Cooke, supra,* 163 *N.J.* at 664–71, 751 *A.*2d 92. There is no need to duplicate that history within this opinion. To some, it may appear that our analyses of the automobile exception have not always traveled in a straight line; this, however, is due not to mere vagary or whim but to the myriad situations, and the inherently unpredictable nature of those situations, in which the automobile exception comes into play. Incidents that are "unforeseen and spontaneous," *Pena–Flores, supra,* 198 *N.J.* at 21, 965 *A.*2d 114, do not lend themselves to neat categorization. We have, for instance, in the past, observed the difficulties involved in analyzing a search that "fits neatly into no category, although arguably fitting into several." *State v. Esteves,* 93 *N.J.* 498, 503, 461 *A.*2d 1128 (1983) (upholding warrantless search of vehicle following a report that armed man had been seen in it). "Law no less than life does not fit exactly into categories." *State v. Hill,* 115 *N.J.* 169, 178, 557 *A.*2d 322 (1989) (O'Hern, J., dissenting).

Certain principles can nonetheless be distilled from the various cases in which we have had occasion to consider the automobile exception to the warrant requirement. First, the stop itself must be unplanned and unforeseen; the police must "have no advance knowledge of the events to unfold." *State v. Colvin,* 123 *N.J.* 428, 437, 587 *A.*2d 1278 (1991) (upholding warrantless search of parked car conducted without advance planning where police had articulable reasons to fear evidence would be lost or destroyed). Thus, the police cannot, by their actions, create the exigency they later use to justify the search. *State v. Hutchins,*

116 *N.J.* 457, 475–76, 561 *A.*2d 1142 (1989) (noting that principle in the context of the warrantless entry into a home); *State v. Williams,* 168 *N.J.Super.* 352, 358, 403 *A.*2d 28 (App.Div.1979) (suppressing results of search when police purposely delayed searching a vehicle until it was en route).

 Second, the police must have probable cause to believe the automobile contains contraband or evidence of criminality. *Pena–Flores, supra,* 198 *N.J.* at 28, 965 *A.*2d 114. Mere suspicion is not enough for probable cause. *State v. Brown,* 205 *N.J.* 133, 144, 14 *A.*3d 26 (2011).

It is the third element, exigent circumstances making it impracticable to obtain a warrant, *Pena–Flores, supra,* 198 *N.J.* at 28, 965 *A.*2d 114, that the Appellate Division found lacking here, *Minitee, supra,* 415 *N.J.Super.* at 486, 2 *A.*3d 447. The panel reached that conclusion based upon this Court's most recent discussion of exigent circumstances in *Pena–Flores.* *Id.* at 485–86, 2 *A.*3d 447. It pointed to our recitation in *Pena–Flores* of various factors that can contribute to the presence of exigent circumstances:

> They include, for example, the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.
>
> [*Pena–Flores, supra,* 198 *N.J.* at 29, 965 *A.*2d 114.]

 The Appellate Division examined these enumerated factors and concluded that they did not support the warrantless search that took place here. *Minitee, supra,* 415 *N.J.Super.* at 485–86, 2 *A.*3d 447. Our recitation in *Pena–Flores,* however, was never intended to be an exhaustive list of the factors that must come into play. The creation of such a list is beyond our skill to outline; it is as boundless as the possible situations that may confront an officer. Indeed, we noted in *Pena–Flores, supra,* that

"[l]egitimate considerations are as varied as the possible scenarios surrounding an automobile stop." 198 *N.J.* at 29, 965 *A.*2d 114.

In *Pena–Flores,* we were dealing specifically with a vehicle that had been stopped for an observed motor vehicle infraction. *Id.* at 12, 965 *A.*2d 114. Our attempt in that opinion to sketch the parameters of exigent circumstances must be understood within that factual complex. Here, there were other factors, not relevant to the *Pena–Flores* factual context, which demonstrated that the Fort Lee police were, indeed, confronted with exigent circumstances. These factors include an armed robbery, at least two perpetrators on the run who were possibly armed, a search for those perpetrators that spanned several municipalities, and an attempt to find a discarded weapon before an innocent bystander was injured or it was taken and hidden for future criminal activity. In addition, the incident occurred on a cold winter night, and the site where the SUV came to rest was poorly lit and not amenable to a thorough search. Those on the scene were cognizant, moreover, of the possibility of a hasty search impairing the evidential value of what they may have come upon. Further, they had no assurance that those who ran from the SUV were not in the immediate vicinity and able to fire at them at will. We have in other cases upheld the warrantless search of a vehicle that had been towed to a safe place. *Martin, supra,* 87 *N.J.* at 563–64, 436 *A.*2d 96; *State v. La Porte,* 62 *N.J.* 312, 316, 301 *A.*2d 146 (1973). *Pena–Flores,* which dealt with an entirely different factual scenario, did not purport to overrule those cases. And because the facts of *Pena–Flores* are so distinguishable from this matter, its legal principles are not dispositive of this matter.

We consider *Martin* to be especially instructive. In that case, two men robbed the employees of an ice-cream store at gunpoint as they were closing the shop at approximately 1:30 in the morning. *Martin, supra,* 87 *N.J.* at 564, 436 *A.*2d 96. The police had a description of the robbers and the car in which they fled. *Ibid.* The officers located the car in a parking lot about twenty minutes later, and two employees of the store positively identified

it. *Id.* at 565, 436 *A.*2d 96. Looking into the car, the police could see a glove that matched the description of a glove worn by one of the robbers. *Ibid.* The police had the car towed to the police station and proceeded to search it without obtaining a warrant. *Ibid.* In upholding this search, we noted that the suspected robbers were at large, as well as the fact that the lighting where the car was discovered was "dim at best." *Id.* at 569–70, 436 *A.*2d 96.

> The level of exigency in the circumstances surrounding this search was heightened by the fact that the police were actively involved in an ongoing investigation shortly after the armed robbery and near to where it had occurred.... There was an urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery, before the suspects had an opportunity to leave the area or to destroy or dispose of other evidence.
>
> [*Id.* at 570, 436 *A.*2d 96.]

These words are fully applicable to the situation confronting the Fort Lee police.

■■■■ Moreover, we do not consider it fatal to the validity of this search that by the time it took place the vehicle had been at police headquarters for some period of time. The difficulties the police faced were exacerbated by the multiple sites that had to be carefully examined for clues with respect to the identity of the perpetrators, the critical need to locate the handgun Baldwin told the police he had discarded when he was on the run, as well as by the fact that the events were not unfolding during normal business hours but, rather, close to midnight and the hours beyond in the dead of winter. The confluence of those multiple factors lead us to conclude that the actions of the police were reasonable under the circumstances. " '[T]he question is not whether the police could have done something different, but whether their actions, when viewed as a whole, were objectively reasonable.' " *State v. O'Donnell,* 203 *N.J.* 160, 162, 1 *A.*3d 604 (2010) (quoting *State v. Bogan,* 200 *N.J.* 61, 81, 975 *A.*2d 377 (2009)). It is only searches that are objectively unreasonable that run afoul of constitutional principles. *State v. O'Hagen,* 380 *N.J.Super.* 133, 141, 881 *A.*2d 733 (App.Div.2005), *aff'd,* 189 *N.J.* 140, 914 *A.*2d 267 (2007) (upholding requirement that upon conviction defendant provide a DNA sam-

ple). Nothing within *Pena–Flores* would lead us to conclude that the search of this vehicle was objectively unreasonable in the totality of the circumstances.

Because we are satisfied that the trial court correctly denied defendants' motion to suppress, it is unnecessary to address the State's additional arguments, including its assertion that defendant Bland lacked the requisite standing to challenge the search.

## IV.

The judgment of the Appellate Division is reversed, and defendants' convictions are reinstated.

Justice ALBIN, dissenting.

Our jurisprudence holds that to justify the warrantless search of a vehicle based on exigent circumstances, the police must establish that the securing of a warrant was "impracticable" and that the need to conduct the search was "urgent" and "immediate." *See State v. Pena–Flores*, 198 *N.J.* 6, 28, 32, 965 *A.2d* 114 (2009); *State v. Martin*, 87 *N.J.* 561, 569–70, 436 *A.2d* 96 (1981). By that now well-established standard, the Appellate Division determined that the State fell short of showing that the search of a vehicle, held for more than three hours in police custody, was exigent. Nevertheless, the majority reverses the appellate panel's unremarkable application of our precedents to the present facts.

Although the majority saves the evidence in this case from suppression, it does so at a significant cost to the warrant requirement of Article I, Paragraph 7 of the New Jersey Constitution. Nothing in the record suggests that the police ever attempted to obtain a search warrant in the more than three hours before they undertook the search or that the need for the search was "immediate" and "urgent" after so long a delay. Because the majority has taken the exigency out of exigent circumstances, thus eroding the primacy of the warrant requirement, I respectfully dissent.

I.

At approximately 10:34 p.m., a Borough of Fort Lee police officer pursued a red sport utility vehicle (SUV) reported to have been involved in an armed robbery. When the officer approached the SUV, which was stopped at a light, a man exited with a handgun and handbag. On the officer's command, the suspect dropped the handgun and bag on the ground; he then fled on foot. The other occupants of the SUV—in disregard of the officer's order—took flight in the vehicle. Another officer found the SUV stopped at the end of a dead end street, with two female occupants—defendant Alnesha Minitee and Liakesha Jones—standing outside the vehicle. Although the women claimed to be victims of a carjacking, they were placed in separate police cars and later arrested for their alleged roles in the robbery. At this time, at least five other Fort Lee police officers were on the scene. A detective observed two rolls of duct tape in the rear of the SUV. Duct tape had been used to restrain the robbery victims.

No one questions that the police had probable cause to search the vehicle. One could hardly question that, at the scene, exigent circumstances would have justified an immediate search of the vehicle; after all, it was believed that two robbers—one possibly armed—were on the loose. However, despite the number of officers at the scene who undoubtedly were equipped with standard-issue flashlights, the police evidently did not consider an immediate search to be of urgency.

At some point, the SUV was towed to a sally port at the Fort Lee Police Department, where it remained impounded until members of the Bureau of Criminal Investigation (BCI) came to process the contents of the SUV. The search of the vehicle did not begin until sometime after 2:00 a.m.—and perhaps much later. In any event, the search did not commence until more than three hours after the seizure of the vehicle.

The officers who testified at the suppression hearing indicated that the decision had been made to await the arrival of BCI officers to "process" and "preserve" the vehicle and to "secure

evidence." The BCI officers had been busy processing the crime scenes. Apparently, the concern was not to disturb anything of evidential value in the vehicle and to leave the task of processing evidence to the BCI experts.

No one testified that it would have been impracticable to secure a warrant—telephonic or otherwise—in the more than three hours before the search. No one testified that there was not a single Fort Lee police officer familiar with the investigation available to call a judge. No one explained why, if there was an "urgent, immediate need" to search the SUV to assist in ascertaining the whereabouts of the suspects, the police had the luxury of waiting more than three hours for the BCI officers to formally process the vehicle. Obviously, if time were of the essence, a search of the SUV would not have been suspended for more than three hours.

On this basis, following this Court's decision in *Pena–Flores,* the Appellate Division suppressed the evidence obtained from the vehicle. *State v. Minitee,* 415 *N.J.Super.* 475, 488–89, 2 *A.*3d 447 (App.Div.2010).

## II.

"Warrantless searches are presumptively unreasonable [under Article I, Paragraph 7 of our State Constitution] and thus are prohibited unless they fall within a recognized exception to the warrant requirement." *Pena–Flores, supra,* 198 *N.J.* at 18, 965 *A.*2d 114. The State claims that the warrantless search of the SUV was justified by the exigent-circumstances exception. The State bears the burden of proving by a preponderance of the evidence the justification for a warrantless search. *State v. Wilson,* 178 *N.J.* 7, 12–13, 833 *A.*2d 1087 (2003). Here, the State had to prove the presence of "exigent circumstances" that made it "impracticable to obtain a warrant." *Pena–Flores, supra,* 198 *N.J.* at 28, 965 *A.*2d 114; *see also State v. Colvin,* 123 *N.J.* 428, 437, 587 *A.*2d 1278 (1991) ("The justification to conduct a warrantless automobile search .... turns on the circumstances that make it impracticable to obtain a warrant ...."). "[E]xigent circum-

stances will be present when inaction due to the time needed to obtain a warrant will create a substantial likelihood that ... evidence will be destroyed or removed from the scene." *State v. Johnson*, 193 *N.J.* 528, 553, 940 *A.*2d 1185 (2008). In this case, no prompt action was taken to conduct a search to preserve or utilize evidence for the ongoing investigation, and no satisfactory explanation was given for the failure to seek a warrant.

The majority imprecisely compares the present case to *Martin.* In *Martin*, the police found the station wagon believed to have been involved in an earlier store robbery and removed the vehicle to headquarters to be searched. *Martin, supra*, 87 *N.J.* at 564–65, 436 *A.*2d 96. The Court determined that there was an "urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery," yet also recognized that it "was impractical and perhaps not safe for the officers" to conduct the search at the scene. *Id.* at 570–71, 436 *A.*2d 96. Thus, the Court held that exigent circumstances were present to bypass the warrant requirement. Nothing in *Martin* even remotely suggests that the police delayed either the towing of the vehicle or its search once it arrived at headquarters. Indeed, a delay of three hours or more in conducting the search in *Martin*—had it occurred—would have rendered a mockery the language the Court used: an "urgent, immediate need" to conduct the search.

The majority endorses the seemingly limitless expansion of the exigent-circumstances exception, validating a warrantless search of a vehicle more than three hours after its seizure, despite the State's failure to show that it was impracticable to secure a warrant. The application of the exigent-circumstances exception to circumstances that are clearly not exigent indicates that this constitutional doctrine is so formless that it can justify almost any outcome.

### III.

In summary, I do not doubt that a search of the SUV at the scene or even its immediate search at headquarters, provided that

the vehicle was promptly towed, would have fallen within the exigent-circumstances exception to the warrant requirement. But that is not what happened here.

The record shows that more than three hours passed from the time the SUV was seized until its search and that, in the meantime, no effort was made to secure even a telephonic warrant. The State did not establish that it was impracticable to secure a warrant because of the urgent, immediate need to conduct a search. Any uncertainty concerning how long the search was delayed—whether three, four, or five hours—must be held against the State, for it bore the burden of establishing a legitimate exception to the warrant requirement. Because I agree with the Appellate Division that the State failed to prove that exigent circumstances justified a bypass of the warrant requirement, I respectfully dissent.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LaVECCHIA, HOENS and PATTERSON and Judge WEFING (temporarily assigned)—5.

*For affirmance*—Justice ALBIN—1.