NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1059-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

MARK DUBAS,

 Defendant-Appellant.
——————————————————————————————

 Submitted December 8, 2016 – Decided March 1, 2017

 Before Judges Hoffman and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Passaic County, Indictment No.
 11-09-0767.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Michael J. Confusione,
 Designated Counsel, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Lila B. Leonard,
 Deputy Attorney General, of counsel and on
 the brief).

PER CURIAM

 Following a bench trial on an eight-count Passaic County

indictment, the trial judge convicted defendant Mark Dubas of

first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a); theft
by unlawful taking, N.J.S.A. 2C:20-3; theft of a motor vehicle,

N.J.S.A. 2C:20-2(b)(2)(b); and possession of a controlled

dangerous substance; N.J.S.A. 2C:35-10(a)(1). The judge

sentenced defendant to twenty-four years in prison for the

aggravated manslaughter conviction, subject to an eighty-five

percent period of parole ineligibility pursuant to the No Early

Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge also

sentenced defendant to a concurrent six-month term of

imprisonment and two concurrent four-year terms for the other

convictions.

 On appeal, defendant raises the following arguments:

 Point 1

 The trial court erred in denying defendant's
 motion for suppression of statements of
 defendant and evidence seized by police.

 Point 2

 Defendant's sentence is improper and
 excessive.

After reviewing the record in light of the contentions advanced

on appeal, we affirm.

 I.

 We briefly summarize the facts from the record. At

approximately 6:30 a.m. on the morning of April 1, 2011, Clifton

Police arrested defendant after discovering heroin, cocaine, and

related paraphernalia next to and inside the car he was driving.
 2 A-1059-14T2
The car belonged to defendant's grandmother. Defendant had

stayed at her home the previous week.

 After learning defendant had been arrested, defendant's

mother called defendant's grandmother, at approximately 7:30

a.m. When she received no response, she called the Clifton

Police Department and then traveled to the grandmother's house

with her husband. When Clifton Police Officer Victor Reyes

arrived at the home, he found all the doors and windows locked

except for one open window on the second floor. After a Clifton

firefighter entered the window and came downstairs to open the

door, defendant's mother entered the home and found the

grandmother lying dead on the basement floor in a pool of blood,

her body covered by a rug, with a pair of scissors sticking out

of her back. According to the medical examiner's testimony at

trial, the cause of death was cut wounds to the head, neck, and

torso, and the manner of death was homicide.

 Prior to questioning defendant at the police station,

detectives presented defendant with a Miranda1 waiver form, which

he signed. At the end of the interview, police collected

defendant's clothing; the State police lab determined through

DNA analysis that the blood on defendant's shoes and pants

belonged to the victim. Police also determined that the bloody

1
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.
2d 694 (1966).
 3 A-1059-14T2
footprints found at the scene matched defendant's sneaker

treads. Police further searched a sports bag and found in the

car during his arrest and discovered ten items of jewelry inside

the bag. Defendant's mother told police that three of these

items belonged to defendant's grandmother.

 On March 12 and May 13, 2014, the trial judge conducted a

Miranda hearing regarding defendant's motion to suppress his

statements to police. On May 14, 2014, the judge denied

defendant's motion, and then began the bench trial. Following

all of the testimony, the judge heard arguments on defendant's

motion to suppress the physical evidence. The judge granted the

motion with regard to the cocaine, but denied suppression of all

other evidence. The judge then found defendant guilty of the

offenses noted above.

 II.

 Defendant argues on appeal that the trial judge should have

granted his motion to suppress his statements to police,

contending: (1) he invoked his right to counsel, (2) he invoked

his right to silence, (3) police did not properly advise him

that he was a suspect in a murder investigation, and (4) his

statements were not voluntary because he needed medical

treatment during the interrogation. We reject these arguments.

 4 A-1059-14T2
 The events of defendant's interrogation proceeded as

follows. After arriving at the police station, defendant waited

there for approximately twelve hours; questioning began around

5:50 p.m. At the beginning of his interview, defendant

complained of a pain in his leg and told the detectives he

wanted to go to the hospital. Detective Aliano, one of the

interrogating officers, asked defendant whether he would be

willing to speak with him regarding "some things that we're

looking into" before going to the hospital. Defendant

responded, "I mean without a lawyer present?" Aliano then

explained that he had a Miranda form for defendant to review,

and that he could not talk to him without reviewing the form.

Defendant replied that he would "answer what questions I can

without a lawyer present."

 The detectives then reviewed the Miranda form with

defendant, going line-by-line over each statement of rights.

When the officer asked defendant if he understood the line

advising that he had the right to speak with a lawyer, defendant

responded, "Mm-hm. But I don't have a lawyer present 'cause I'd

have to get one, right?" The detective began to respond,

"Exactly. 'If you want . . . ,'" but defendant cut him off and

continued reading the portion regarding his right to counsel.

Upon reaching the bottom waiver paragraph, defendant read the

 5 A-1059-14T2
line, "I am willing to talk," and then stated, "[A]nd answer

certain questions I'll add to that." Defendant continued

reading and then said, "You're making me sign . . . that I don't

want a lawyer."

 Following this statement, Detective Aliano explained the

purpose of the waiver form, stating, "At any time you have the

right to stop talking. So if there's anything that you don't

want to talk about you can always stop talking to us about that

and ask for an attorney." In order to ensure defendant

understood, Detective Aiello had defendant read the waiver

paragraph again. The following exchange then occurred:

 Q: Do you understand that? Are you willing
 to talk to us and answer questions whatever
 – like you said certain questions . . .

 A: Yeah

 Q: . . . without a lawyer right now?

 A: Mm-hm.

 Q: Okay. Then sign the form right there. I
 just want to make sure that you understand
 it and we're clear as to – as to what, you
 know, it is that you're reading.

 Defendant signed the waiver form and the officers proceeded

with questioning. At one point during the interview, defendant

stated he needed "physical help" and was "craving a doctor right

now." The detectives requested emergency medical services and

informed defendant an ambulance was on the way, and they
 6 A-1059-14T2
obtained defendant's permission to continue talking while they

waited. Shortly thereafter, approximately thirty-five minutes

after the Miranda warnings, the detectives informed defendant

his grandmother was dead and they believed he killed her. The

detectives also told defendant he was being charged with murder

and attempted to induce defendant to confess. Defendant

eventually responded, "I'm pleading the Fifth. I'm not talking

to you guys anymore." The detectives then ended the interview.2

 Following the Miranda hearing regarding these events, the

trial judge denied defendant's motion to suppress his

statements. The judge determined defendant did not invoke his

right to counsel, finding defendant "made reference to . . . not

having a lawyer at this time and perhaps getting one or needing

one. But he doesn't say when." The judge noted defendant made

some ambiguous references to counsel, but determined the

detectives clarified these statements "several times" in order

to determine "exactly what it was that the defendant Dubas

wanted[,]" in accordance with State v. Alston, 204 N.J. 614

(2011).

2
 The record shows one of the detectives asked defendant
several additional questions after this point. The trial judge
noted this final portion should be suppressed but found
defendant did not make any additional admissions. The judge
also acknowledged defendant planned to use some of his
statements as part of his defense strategy.
 7 A-1059-14T2
 The trial judge then found defendant invoked his right to

remain silent near the end of the interview when he stated "I'm

not talking to you guys anymore." Last, the judge discussed how

the detectives did not tell defendant he would be questioned

about his grandmother at the beginning of the interview. Noting

it was a "close call," the judge found the police did not

purposely delay filing formal charges in "bad faith" in order to

interview defendant without informing him of the situation.

 In reviewing a motion to suppress, we "must uphold the

factual findings underlying the trial court's decision so long

as those findings are supported by sufficient credible evidence

in the record." State v. Elders, 192 N.J. 224, 243 (2007)

(citation omitted). However, the trial court's application of

the law to the factual findings is not given the same deference.

State v. Handy, 206 N.J. 39, 45 (2011).

 We first address defendant's argument regarding his right

to counsel. When a defendant challenges a statement made during

a police interrogation, the State must prove beyond a reasonable

doubt that the waiver of the defendant's Miranda rights "was

knowing, intelligent, and voluntary in light of all the

circumstances." State v. Presha, 163 N.J. 304, 313 (2000). If

an individual "indicates in any manner and at any stage of the

process that he wishes to consult with an attorney before

 8 A-1059-14T2
speaking there can be no questioning." Miranda, supra, 384 U.S.

at 444-45, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707.

 Our Supreme Court has held that "a suspect need not be

articulate, clear, or explicit in requesting counsel; any

indication of a desire for counsel, however ambiguous, will

trigger entitlement to counsel." State v. Reed, 133 N.J. 237,

253 (1993). To determine whether an individual has invoked his

or her right to counsel, our courts employ a "totality of the

circumstances approach that focuses on the reasonable

interpretation of [the] defendant's words and behaviors." State

v. Diaz-Bridges, 208 N.J. 544, 564 (2012).

 Should a suspect's "words amount to even an ambiguous

request for counsel, the questioning must cease, although

clarification is permitted; if the statements are so ambiguous

that they cannot be understood to be the assertion of a right,

clarification is not only permitted but needed." Alston, supra,

204 N.J. at 624. In responding to an ambiguous statement, the

officer must limit himself or herself to clarification, "not

questions that operate to[] delay, confuse, or burden the

suspect in his assertion of his rights." State v. Johnson, 120

N.J. 263, 283 (1990) (citation omitted).

 Defendant argues his statements indicating his willingness

to answer questions without a lawyer present were "at least

 9 A-1059-14T2
ambiguous," requiring the detectives to "confirm or clarify

whether he was asserting his right to counsel." Although the

trial judge found the detectives did so "several times,"

defendant maintains the detectives "did not clarify defendant's

inquiries or references to obtaining counsel; they bypassed it."

 Defendant's argument lacks merit. The record clearly shows

that in response to defendant's ambiguous statements regarding

counsel, the detectives took the time to carefully ensure he

understood he was waiving this right. Although the detectives

may not have asked defendant point-blank, "Do you want a

lawyer," as the interrogating officer did in Alston, supra, 204

N.J. at 626, the detectives made significant efforts to ensure

defendant understood his rights before he signed the waiver

form. Under the totality of the circumstances, we discern no

basis for disturbing the trial judge's conclusion that defendant

waived his right to counsel knowingly, intelligently, and

voluntarily.

 Defendant similarly argues his statements to police were

inadmissible because he invoked his right to remain silent.

When a defendant unambiguously invokes his right to silence,

interrogation must immediately cease. State v. Maltese, 222

N.J. 525, 545 (2015). However, where the invocation is

ambiguous, the officers must "stop the interrogation completely"

 10 A-1059-14T2
or "ask only questions narrowly directed to determining whether

defendant [is] willing to continue." Ibid. (alteration in

original) (quoting Johnson, supra, 120 N.J. at 284). Whether

the defendant has invoked his or her right turns on the totality

of the circumstances. Diaz-Bridges, supra, 208 N.J. at 569.

 In Maltese, supra, 222 N.J. at 546, our Supreme Court held

a suspect's repeated statements to interrogating officers that

he wanted to speak with his uncle before answering questions

constituted an invocation of the right to remain silent.

Defendant argues the same conclusion applies here, contending he

invoked his right to silence at several points during the

interrogation; specifically, when he told the detectives he

would only answer "certain questions" and that there were some

questions he could not answer, when he said, "You're making me

sign that I don't want a lawyer," and when he told the officers

he needed "help." We disagree. Based on the totality of the

circumstances, we find these statements do not constitute

ambiguous invocations of the right to silence. We therefore

reach the same conclusion as the trial judge, that defendant did

not invoke his right to silence until he said he was "pleading

the Fifth" in response to the questions about his grandmother's

death.

 11 A-1059-14T2
 Next, defendant argues his Miranda waiver was involuntary

because the detectives did not inform him he was a murder

suspect at the beginning of the interview, in violation of State

v. A.G.D., 178 N.J. 56 (2003), and its progeny. Defendant

contends the trial court's finding was erroneous because there

is no "bad faith" requirement in the A.G.D. test.

 In A.G.D., our Supreme Court held a defendant's Miranda

waiver was invalid because the police "did not inform him that

an arrest warrant had been issued against him." Id. at 66. The

Court continued, "Without advising the suspect of his true

status when he does not otherwise know it, the State cannot

sustain its burden to the Court' satisfaction that the suspect

has exercised an informed waiver of rights . . . ." Id. at 68.

Defendant contends he did not knowingly waive his rights under

this standard because police did not inform him he was being

charged with murder until approximately thirty-five minutes

after the Miranda warnings.

 This argument lacks merit. In State v. Nyhammer, 197 N.J.

383, 404-05, cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L.

Ed. 2d 48 (2009), our Supreme Court distinguished A.G.D., noting

in the absence of an arrest warrant or criminal complaint, a

defendant's status as a suspect "is not an objectively

verifiable and discrete fact" for the interrogating officers.

 12 A-1059-14T2
Rather than applying a bright-line rule, the Court held the

failure to inform a defendant of his suspect status at the time

of the Miranda warnings is a factor in the totality-of-the-

circumstances test for determining whether the suspect validly

waived his rights. Id. at 405, 407-08.

 Applying this standard, we find the trial court

appropriately determined defendant knowingly and voluntarily

waived his rights. Unlike A.G.D., at the time of the

interrogation, police obtained search warrants but they had not

filed an arrest warrant or criminal complaint against defendant.

Moreover, shortly after completing the Miranda waiver form, the

detectives began asking defendant questions about his

grandmother's car. Although this occurred after the initial

waiver, defendant clearly demonstrated later in the interview he

had the mental capacity to assert his rights. The detectives

further asked defendant if he knew why he was being questioned,

to which defendant replied, "[b]ecause of drugs." Detective

Aliano responded, "Well, and – other things, too[,]" and asked

defendant if he knew what else they might ask about. Defendant

responded, "The fact that I was in my grandma's car."

 Based on these exchanges, as well as defendant's review of

the Miranda waiver form, it is clear defendant was generally

aware of the relevant circumstances and therefore made a valid

 13 A-1059-14T2
waiver of his Miranda rights. We are satisfied the trial

court's conclusion was not erroneous.

 Last, defendant contends the State did not prove his

statements were voluntary, arguing because he was in custody for

twelve hours prior to the interrogation, and because he needed

medical treatment, his decision-making ability was impaired. We

disagree. Based on our review of the record, it is clear that

despite defendant's alleged medical issues he was attentive and

competent during the interview. We find no basis to disturb the

trial judge's ruling on defendant's motion to suppress.

 III.

 Defendant next argues the trial judge erred by denying his

motion to suppress the physical evidence seized from his person

and his grandmother's car. Defendant contends the police

violated his Fourth Amendment rights by stopping him without

reasonable suspicion and subsequently seizing the items during a

warrantless search. Defendant further argues, because the

police violated his rights, the court should have suppressed the

physical evidence and his statements as "fruits" of the illegal

search and seizure. We disagree.

 During trial, three Clifton police officers testified to

the events of defendant's initial arrest. On April 1, 2011, at

approximately 6:30 a.m., Officer Justin Varga arrived at

 14 A-1059-14T2
Maplewood Avenue, a residential neighborhood, due to a report of

a suspicious individual ringing doorbells asking for a drink.

Upon arriving at the scene, Officer Varga observed a parked 1992

Saturn car. Officer Varga approached the vehicle in his marked

police car and activated his overhead lights. At this point,

defendant exited the Saturn car and walked toward Officer Varga,

stating to the officer that his car would not start.

 Officer Varga walked with defendant back to the Saturn.

Defendant got into the driver's seat, but the car did not start

when defendant turned the key. Varga noted he was not

investigating a crime during this time, but was trying to help

defendant as a "community caregiver." Officer Varga's backup,

Officer Hriczov, arrived at the scene, and defendant was asked

to produce his license. When the police noticed defendant's

license said he lived in Wayne, defendant told police he had

been living with his grandmother in Clifton, at her home on

Knapp Avenue, for approximately one week. Defendant stated he

borrowed the car from his grandmother.

 While speaking with defendant, the officers observed

hypodermic needles and an open needle in the front passenger

seat of defendant's vehicle. The officers asked defendant where

he was coming from, and defendant responded he had been at a

needle exchange in Paterson and was now returning home to Knapp

 15 A-1059-14T2
Avenue. However, when the officers asked defendant why his car

was facing Paterson since he had come from that direction,

defendant became "nervous [and] flustered." Officer Varga

further noticed "six glassine baggies" and a used hypodermic

needle outside defendant's driver-side window.

 Another officer, Officer Eliasz, arrived at the scene.

Without entering the vehicle, Officer Eliasz looked through the

car windows and observed two hypodermic syringes and glassine

envelopes consistent with heroin use on the back seat and floor.

Defendant told the officers these items "must be one of my

friend's." Officer Eliasz proceeded to search the car and

further discovered purple bags, which he suspected contained

cocaine, under an ashtray in the center console. Defendant

again denied the substances were his. Police then placed

defendant under arrest for possession of controlled substances.

 Reviewing this testimony, the trial judge found the police

acted appropriately in arresting and searching defendant. The

judge noted Officer Varga first approached defendant's car as a

community caretaker, and then observed the needles and heroin

outside the car under the plain view exception to the warrant

requirement. Officer Eliasz further looked in the vehicle and

noticed a syringe and heroin envelopes in plain view. At that

point, the judge determined the officers had probable cause to

 16 A-1059-14T2
arrest defendant for heroin possession, and therefore the

officers appropriately searched defendant's car and backpack

under the search incident to arrest doctrine. The judge ruled

all the physical evidence was admissible except the cocaine,

which was not in a position where defendant could have reached

it during the arrest.

 The Fourth Amendment to the United States Constitution and

Article I, paragraph 7 of the New Jersey Constitution preclude

the police from undertaking a warrantless search or seizure

unless the search or seizure falls within one of the few

exceptions to the warrant requirement. State v. Rodriguez, 172

N.J. 117, 125 (2002) (quoting State v. Maryland, 167 N.J. 471,

482 (2001)). These exceptions include limited instances where

police are performing a community caretaking function, State v.

Vargas, 213 N.J. 301, 305 (2013); when items are found in plain

view, State v. Gonzales, 227 N.J. 77, 101 (2016); and when a

search is incident to a lawful arrest, State v. Minitee, 210

N.J. 307, 318 (2012).

 First, the community caretaking doctrine excuses the

warrant requirement when police officers are acting "to ensure

the safety and welfare of the citizenry at large." State v.

Diloreto, 180 N.J. 264, 276 (2004) (citation omitted). Police

must be acting in a way that is unrelated to their criminal

 17 A-1059-14T2
investigatory duties, and courts should use a reasonableness

standard to determine whether police conduct was appropriate

under the circumstances. Id. at 275-76.

 Next, our Supreme Court developed a three-part test to

determine whether the plain view exception may excuse a

warrantless search. State v. Earls, 214 N.J. 564, 592 (2013).

Specifically, the doctrine requires (1) the officer must be

"lawfully in the viewing area"; (2) it must be "immediately

apparent" to the officer that the items in plain view "were

evidence of a crime" or are contraband; and (3) the evidence

must be discovered "inadvertently." Ibid. (quoting State v.

Mann, 203 N.J. 328, 341 (2007)).3

 Finally, under the search incident to arrest doctrine,

police may search a person and the area within his immediate

grasp during a legal arrest in order to ensure their safety and

prevent the destruction of evidence. See Minitee, supra, 210

N.J. at 318; State v. Pena-Flores, 198 N.J. 6, 20 (2009) ("[T]he

search incident to arrest exception is focused on the arrestee

himself and on eliminating his potential to endanger the police

or destroy evidence."), overruled on other grounds by State v.

3
 Our Supreme Court recently eliminated the "inadvertence
prong" from the plain-view exception to the warrant requirement,
applying this new rule of law prospectively. See Gonzales,
supra, 227 N.J. at 101. Therefore, we analyze the circumstances
in the instant matter under the prior three-prong test.
 18 A-1059-14T2
Witt, 223 N.J. 409 (2015). The search can occur prior to the

arrest if it is "part of a single uninterrupted transaction."

State v. O'Neal, 190 N.J. 601, 614 (2007) (quoting State v.

Bell, 195 N.J. Super. 49, 58 (1984)). However, the doctrine

does not apply where a suspect "has no capacity to reach the

interior of the vehicle to destroy evidence or to endanger the

police." State v. Dunlap, 185 N.J. 543, 548-49 (2006).

 Applying these standards, we find the trial judge did not

abuse his discretion in denying defendant's motion to suppress

the physical evidence. Although he activated his overhead

lights upon arriving at the scene, it is clear Officer Varga

first approached defendant's car pursuant to his role as a

community caretaker in order to help defendant start his car.

Therefore, he was lawfully beside defendant's car when he

"inadvertently" noticed, in plain view, the "immediately

apparent" evidence of contraband. Earls, supra, 214 N.J. at

592.

 The trial judge appropriately determined the situation then

evolved into a search incident to arrest. Although defendant

was outside the vehicle, because he was not yet handcuffed, the

judge found the officers had the right to "search the car [and]

the immediate area within the defendant's grasp . . . to see if

there [were] any weapons, to make sure they were not unsafe."

 19 A-1059-14T2
The judge included officer Eliasz's search of defendant's

backpack under the reasoning, finding it also could have

contained a weapon. The judge further determined the search

occurred "simultaneously" with the arrest. We therefore discern

no basis to disturb the trial judge's well-reasoned findings and

conclusions regarding the arrest and search.

 Defendant further contends the police unlawfully obtained

his statements and seized the additional evidence without a

warrant as "fruits" of the unlawful search, including a letter,

cell phones, defendant's jeans and sneakers, the DNA sample, a

receipt, and the jewelry. However, Detective Aliano testified

police obtained search warrants for the car, the grandmother's

home, and defendant's clothes and bag prior to his

interrogation. Because defendant's initial arrest was valid,

his argument with regard to the other evidence lacks merit.

 IV.

 Last, defendant argues his sentence was improper and

excessive because the court failed to appropriately weigh the

aggravating and mitigating factors during sentencing. We

disagree.

 We maintain a limited scope of review when considering the

trial court's sentencing determinations on appeal. State v.

Roth, 95 N.J. 334, 364-65 (1984). We will ordinarily not

 20 A-1059-14T2
disturb the sentence imposed unless it constitutes a clear error

of judgment or "shocks the judicial conscience." State v.

Blackmon, 202 N.J. 283, 297 (2010) (quoting Roth, supra, 95 N.J.

at 363-65). We are bound to affirm so long as the judge

properly identifies and balances the aggravating and mitigating

factors, and their existence is supported by sufficient credible

evidence in the record. State v. Cassady, 198 N.J. 165, 180-81

(2009). Remand may be required if we determine the sentencing

judge failed to find mitigating factors that "clearly were

supported by the record." State v. Bieniek, 200 N.J. 601, 608

(2010).

 Here, the judge found aggravating factors N.J.S.A. 2C:44-

1(a)(2) (seriousness of the harm including vulnerability of the

victim); (3) (risk of reoffending); (6) (prior criminal record);

(9) (need for deterrence); (12) (offense against a person sixty

years or older); and (13) (using a stolen motor vehicle in the

course of the crime), and gave specific reasons for his

findings. The judge then found mitigating factors N.J.S.A.

2C:44-1(b)(4) (substantial ground excusing defendant's conduct);

(7) (defendant led a law-abiding life); and (11) (excessive

hardship).

 Defendant argues the trial judge erred by failing to give

more weight to the mitigating factors, particularly factor

 21 A-1059-14T2
N.J.S.A. 2C:44-1(b)(4), and also erred by rejecting defendant's

offer of mitigating factors (3) (defendant acted under strong

provocation); (8) (defendant's conduct was the result of

circumstances unlikely to reoccur); and (9) (character of

defendant indicates he is unlikely to reoffend). Defendant

further contends the judge failed to explain the weight he

applied to these factors. However, the record shows the trial

judge thoroughly reviewed and credited defendant's evidence that

his conduct was exacerbated by his use of Prozac. The trial

judge also appropriately rejected mitigating factors (3), (8),

and (9), as the record does not support their application.

Moreover, although the trial judge did not explicitly state the

weight he assigned to each mitigating factor, the record shows

he clearly explained his reasoning for his findings.

 Defendant also argues the judge's reasoning for finding

aggravating factors N.J.S.A. 2C:44-1(a)(2), (3), (6), and (9)

was erroneous. First, defendant argues the judge double counted

factor (2) because the harm to the victim was already part of

the aggravated manslaughter conviction. However, the trial

judge did not base his finding solely on the harm defendant

inflicted, but rather on the vulnerability of the victim.

 Next, defendant contends the judge incorrectly found

aggravating factor (3) (risk of reoffending) and (6) (prior

 22 A-1059-14T2
criminal record) because he also found mitigating factor (7)

(defendant led a law-abiding life). However, the judge made

clear he was only finding factor (7) to a "slight extent,"

noting although defendant lived most of his life without

incident, he fell into the habit of using heroin, an illegal

substance, almost every day. The judge found this drug use and

his mental issues suggested he was at risk for reoffending.

Last, defendant argues the judge erred by giving aggravating

factor (9) significant weight. However, we find the judge

provided adequate reasons for finding this factor based on the

violence in the state and the nation at large.

 In addition to challenging the judge's findings on the

specific aggravating and mitigating factors, defendant also

argues the twenty-four-year sentence for the aggravated

manslaughter conviction was excessive because the judge did not

properly balance and explain the weight assigned to these

factors. However, the record clearly shows the judge

"qualitatively assessed" each factor and assigned each factor

the appropriate weight. State v. Fuentes, 217 N.J. 57, 72-73

(2014). We reject defendant's contention that the aggravating

and mitigating factors were in "equipoise" and find the judge

did not abuse his discretion by imposing a sentence closer to

 23 A-1059-14T2
the maximum term of thirty years for an aggravated manslaughter

conviction. N.J.S.A. 2C:11-4(c).

 Finally, defendant contends the trial judge erred by

denying his motion for reconsideration of his sentence. Because

we find the trial judge did not abuse his discretion during

sentencing, this argument lacks sufficient merit to warrant

discussion in a written opinion. R. 2:11-3(e)(2).

 Affirmed.

 24 A-1059-14T2