14 A.3d 26

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. DANIEL TWIAN BROWN, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued October 12, 2010—Decided January 25, 2011.

134

*Jacqueline E. Turner,* Assistant Deputy Public Defender, argued the cause for appellant and cross-respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Turner* and *Mark E. Tabakman,* Designated Counsel, on letter briefs).

*Annemarie Cozzi,* Senior Assistant Prosecutor, argued the cause for respondent and cross-appellant (*John L. Molinelli,* Bergen County Prosecutor, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Daniel Twian Brown* submitted letter briefs pro se.

Chief Justice RABNER delivered the opinion of the Court.

This case involves the validity of a warrantless arrest and its impact on defendant's post-arrest statements to the police.

The police relied on invalid arrest warrants when they set out to arrest defendant Daniel Brown, at his girlfriend's apartment, for his role in a string of armed robberies and car thefts. Upon hearing the officers knock at the door, Brown fled through an apartment window onto an adjacent roof. After a twenty-minute standoff, the police arrested him. Later at headquarters, Brown made incriminating statements after the police advised him of his *Miranda*[1] rights.

Brown challenged the admission of those statements. Following a hearing, the trial court found that the police had sufficient probable cause to arrest him, and that his subsequent statements were given voluntarily. The court thus denied Brown's motion to suppress. The Appellate Division affirmed this issue on different grounds. It concluded that although Brown's arrest was unlawful, his statements had no connection to, and were attenuated from, the arrest.

We affirm for different reasons. According to the record, Brown immediately fled to a public area when the police arrived at his girlfriend's apartment. At that time, the police had sufficient probable cause to believe that he had committed a felony. They, therefore, did not need a warrant to arrest him in public. The

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

police also had probable cause to arrest Brown for his conduct in resisting arrest, which they observed. As a result, the defective arrest warrants play no role in our analysis, and Brown's post-arrest statements following his lawful arrest are admissible.

I.

In the waning days of December 2004, local law enforcement officials in Bergen County were investigating a series of armed robberies and auto thefts in Hackensack and five nearby towns. The incidents included robberies of four gas stations, a convenience store, and a catering truck, each by three to five assailants.

The last event in the sequence was an unsuccessful attempt to rob a gas station in Hackensack at around 4:30 a.m. on Friday, December 31, 2004. After the gas station attendant called the police, and they broadcast certain details, a Hackensack police officer spotted a car that matched the description of a vehicle used in an earlier robbery. With his overhead lights on, the officer followed the car and saw four occupants run in different directions when it stopped. The officer pursued and arrested the last man out of the car, codefendant Kenyatta Clarke. Clarke was wearing a wool hat with eye holes cut into it.

Clarke later made statements to the police implicating Brown and others. His statements led to the arrests of three others, who also gave incriminating statements to the police. The Appellate Division noted that "all four of the men arrested implicated [Brown] in these crimes."[2]

---

[2] After oral argument, we granted leave for the State to supplement the record with co-defendants' statements that implicated Brown. The State provided statements by Clarke and co-defendant Winston Durant made on December 31, 2004. Clarke, in his third statement of the day, implicated himself and Brown in multiple armed robberies and one car theft; Durant admitted to his own role in multiple robberies and implicated Brown in one attempted robbery. In addition, defense counsel conceded at oral argument that the police had probable cause to arrest Brown. Brown has submitted a pro se letter stating that he does not concede that issue, which we have considered. We are satisfied that the co-

Detective Patrick Coffey of the Hackensack Police Department helped investigate this case. On Saturday, January 1, 2005, he prepared and signed five complaints against Brown. Four complaints sought authorization to arrest Brown for burglary, theft, robbery, possession of a firearm by a convicted person, possession of a weapon for unlawful use, unlawful possession of a weapon, and possession of burglary tools. Those complaints listed Brown's last known address as 406 Prospect Avenue in Hackensack. A fifth complaint charged Brown with resisting arrest by using and threatening violence.[3] It listed an address at 45 Linden Street, Apartment 7, Hackensack, where Brown's girlfriend, Chastity Connor, lived. Detective Coffey learned that Brown could be found there from another officer.

Detective Coffey testified that he left the signed complaints at the front desk of the Hackensack police department, consistent with the practice at the station. He did not bring them to a judge and did not know what happened to the complaints next. It is undisputed that at the time of Brown's arrest on January 1, 2005, no judicial officer had yet reviewed the complaints or authorized Brown's arrest.

At around 10:30 p.m. on January 1, about ten officers went to Connor's address to arrest Brown. Around that time, Brown's mother called Connor's apartment and told her the police were outside the building. Connor testified that she relayed that information to Brown. Shortly after, Detective Coffey and five officers entered the apartment building, and the remaining officers stayed outside and secured the area.

At the suppression hearing, Detective Coffey described what happened next at Connor's apartment: "An officer knocked on the door. The door was opened by a female [Connor]. The officer

---

defendants' statements provided the police with sufficient probable cause—before Brown's arrest—to believe that he had committed serious, violent crimes.

[3] The fifth complaint arose out of Brown's behavior at the time of his arrest. Presumably, it was prepared after the other four.

asked if Danny Brown was there, at which time Mr. Brown jumped out a window on to the roof of" an adjacent building. Coffey testified that he heard a large crash, and another officer said, "He went out the window." [4]

Brown landed on the roof of McManus Tool Rental, located next door at 41–43 Linden Street. Following a twenty-minute standoff, Captain Frank Lomia convinced Brown to come off the roof. The police then arrested Brown and took him to headquarters.

Once at the police station, Detective Coffey and a second officer tried to interview Brown. Detective Coffey testified that Brown was orally advised of his *Miranda* rights. According to Coffey, Brown was aggressive and hostile, and the police ended the short, unproductive session. Captain Lomia and another officer tried to question Brown shortly after. Their interview lasted more than one hour and did not result in any substantive statements. Because Coffey had already administered *Miranda* warnings to Brown, Captain Lomia testified that he did not repeat them. Brown was then taken to the cell block for the night.

Brown gave his first statement to the police early the next afternoon. At around 12:30 p.m. on January 2, 2005, Captain Lomia testified that he approached Brown and asked if he was willing to talk. Brown agreed. Lomia stated that he read *Miranda* warnings to Brown and had him initial and sign a written waiver form. Brown then admitted his involvement in two armed robberies and two auto thefts. During the interview, Captain Lomia typed Brown's statements in a question-and-answer format. Brown then reviewed, initialed, and signed a printed version of the statement.

---

[4] Connor also testified at the suppression hearing. The trial court discounted her testimony insofar as it differed from Detective Coffey's; the judge did not reject her testimony outright. As to the sequence of events, Connor confirmed that as she headed to the front door in response to banging on it, she heard a crashing sound and a voice say, "He's on the roof."

Later in the day, three different groups of police officers from Englewood, River Edge, Garfield, and Lodi interrogated Brown. Each interview followed the same pattern: Brown waived his *Miranda* rights in writing, made incriminating statements, and reviewed and signed typewritten versions of those statements.

The next day, January 3, 2005, a deputy court administrator at the Hackensack Municipal Court reviewed Detective Coffey's complaints for the first time and authorized arrest warrants for Brown. Nothing in the record reveals what happened to the complaints from January 1 to January 3. We note that January 3, 2005 fell on a Monday after a holiday weekend, and there is no evidence that suggests the police deliberately sought to avoid having a judicial officer evaluate the complaints during the holiday weekend.

In addition to the delay, the complaints did not contain any information about Brown that justified his arrest. In response to a request at oral argument, the State submitted copies of each complaint to the Court. The police reports attached to the complaints, which purportedly set forth probable cause for Brown's arrest for robbery, car theft, and gun offenses, did not even mention Brown by name. Only the resisting charge, which recounted events that occurred at the scene of the arrest, referred to Brown's conduct.

A grand jury in Bergen County returned a forty-three count indictment against Brown and others alleging multiple counts of first- and second-degree armed robbery, third-degree theft, weapons offenses, second-degree armed burglary, third-degree aggravated assault, second-degree eluding, and fourth-degree resisting arrest. Brown moved pre-trial to suppress his custodial statements. He argued, among other things, that his arrest was unlawful because the warrants were not authorized until two days after the arrest, that his subsequent statements were thus inadmissible, and that he did not waive his *Miranda* rights. The State countered that even if the warrants were invalid, the police still had probable cause to arrest based on prior statements implicat-

ing Brown by his co-defendants. The State also claimed that by jumping out of the window, Brown's conduct amounted to obstruction of justice and resisting arrest, which justified his arrest.

The trial court denied Brown's motion to suppress. It found sufficient probable cause to arrest Brown based on the statements of his co-defendants, his flight from the apartment, and the twenty-minute standoff with police. After forcefully rejecting Brown's testimony at the hearing on credibility grounds, the court also found that Brown knowingly and voluntarily waived his *Miranda* rights.

A jury convicted Brown on all the counts submitted to it. (Prior to trial, the court dismissed three counts.) The court sentenced Brown to an aggregate term of life imprisonment plus forty-one years, with ninety-three years of parole ineligibility.

Brown appealed. The Appellate Division concluded that because the arrest warrants in this case were not issued until two days after Brown's arrest, "the police lacked the lawful authority to arrest [Brown] on January 1, 2005." However, the Appellate Division found that Brown's rights under *Miranda* were scrupulously honored and that his confession was sufficiently attenuated from his unlawful arrest. The appellate panel therefore found that Brown's statements were properly admitted.[5]

We granted Brown's petition for certification limited to the issue of whether his custodial statements were admissible. 201 *N.J.* 155, 988 *A.*2d 1177 (2010). We also granted the State's cross-petition for certification, in which it challenged the Appellate Division's conclusion that Brown's arrest was unlawful. 204 *N.J.* 38, 6 *A.*3d 441 (2010).

---

[5] For reasons that are not relevant now, the Appellate Division reversed Brown's convictions on seven firearms counts and vacated the sentences imposed on two robbery counts. It affirmed the remaining convictions and remanded for resentencing.

## II.

As to the limited issues before this Court, Brown argues that his statements should be suppressed because his arrest was illegal. He contends that the police needed—and lacked—both arrest and search warrants to take him into custody in a third party's apartment. He also claims that the police created any exigency that might have justified a warrantless arrest.

Brown therefore argues that his statements should be inadmissible as "fruits of the poisonous tree." He also urges this Court to depart from *New York v. Harris*, 495 *U.S.* 14, 21, 110 *S.Ct.* 1640, 1644–45, 109 *L.Ed.*2d 13, 22 (1990) (holding that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home" without a warrant, consent, or exigent circumstances). He submits that neither his arrest for resisting nor the administration of *Miranda* warnings broke the causal connection between his unlawful arrest and statements to the police. Finally, Brown continues to maintain that he did not voluntarily waive his *Miranda* rights.

The State concedes that the arrest warrants were invalid because they had not been executed by a detached court officer. The State nonetheless argues that Brown's arrest was lawful because it was supported by probable cause and exigent circumstances. The State also contends that Brown's statements are properly admitted under *New York v. Harris*. In addition, it argues that Brown's flight, arrest for resisting, and other intervening circumstances purged his voluntary statements of any taint.

The Attorney General, appearing as amicus curiae, stresses that Brown's arrest was legal. She maintains that despite any defect in the arrest warrants, the police had probable cause to arrest Brown and did so lawfully in public. Accordingly, she argues that there is no need to reach the attenuation issue. Her remaining arguments are consistent with the State's.

### III.

To determine the validity of Brown's arrest, we begin with certain basic principles. The Fourth Amendment to the United States Constitution and Article I, Paragraph 7, of the New Jersey Constitution protect "[t]he right of the people to be secure ... against unreasonable searches and seizures." To that end, the Federal and State Constitutions declare that arrest warrants must be supported by probable cause. A warrantless arrest in a public place must satisfy the same standard. *State v. Basil*, 202 *N.J.* 570, 584, 998 *A.*2d 472 (2010) (citing *Maryland v. Pringle*, 540 *U.S.* 366, 370, 124 *S.Ct.* 795, 799, 157 *L.Ed.*2d 769, 774 (2003)).

Because counsel for both sides do not dispute the existence of probable cause, *see supra* 138–39 n. 2, 14 *A.*3d at 29 n. 2, it is not necessary to focus on the standard at length. In short, for an arrest, "there must be probable cause to believe that a crime has been committed and that the person sought to be arrested committed the offense." *State v. Chippero*, 201 *N.J.* 14, 28, 987 *A.*2d 555 (2009) (citation and internal quotation marks omitted). Although it is difficult to define the concept with precision, probable cause requires "more than a mere suspicion of guilt" but less evidence than is needed to convict at trial. *Basil*, *supra*, 202 *N.J.* at 585, 998 *A.*2d 472 (citations omitted). The statements of Brown's co-defendants implicating him in armed robberies meet that test.

The parties' arguments, though, focus at length on whether Brown's arrest was lawful in light of the defective arrest warrants in this case. The warrant requirement provides citizens with protection from unreasonable arrests by having a neutral magistrate determine probable cause before an arrest is made. *State v. Henry*, 133 *N.J.* 104, 110, 627 *A.*2d 125, *cert. denied*, 510 *U.S.* 984, 114 *S.Ct.* 486, 126 *L.Ed.*2d 436 (1993); *see also Johnson v. United States*, 333 *U.S.* 10, 14, 68 *S.Ct.* 367, 369, 92 *L.Ed.* 436, 440 (1948). Without a warrant, the State has the burden of proving the overall reasonableness of an arrest. *See Payton v.*

*New York,* 445 *U.S.* 573, 585, 100 *S.Ct.* 1371, 1379, 63 *L.Ed.*2d 639, 650 (1980); *State v. Mann,* 203 *N.J.* 328, 337–38, 2 *A.*3d 379 (2010).

Absent exigent circumstances or consent, the police must obtain a warrant to conduct an arrest inside a home. *Payton, supra,* 445 *U.S.* at 589–90, 100 *S.Ct.* at 1381–82, 63 *L.Ed.*2d at 652–53; *State v. Hutchins,* 116 *N.J.* 457, 463, 561 *A.*2d 1142 (1989). An arrest warrant "implicitly carries with it the limited authority to enter a dwelling" where the suspect lives when there is reason to believe the suspect is inside. *Payton, supra,* 445 *U.S.* at 603, 100 *S.Ct.* at 1388, 63 *L.Ed.*2d at 661; *see also State v. Jones,* 143 *N.J.* 4, 13, 667 *A.*2d 1043 (1995). To search for the subject of an arrest warrant in the home of a third party, the police must also obtain a search warrant—once again, absent exigent circumstances or consent. *Steagald v. United States,* 451 *U.S.* 204, 216, 101 *S.Ct.* 1642, 1649–50, 68 *L.Ed.*2d 38, 48 (1981).

Despite the important benefits offered by arrest warrants, they are not required in all cases. For example, felony arrests made in public places and supported by probable cause can be valid without a warrant. *United States v. Watson,* 423 *U.S.* 411, 417, 96 *S.Ct.* 820, 824, 46 *L.Ed.*2d 598, 605 (1976) (quoting *Carroll v. United States,* 267 *U.S.* 132, 156, 45 *S.Ct.* 280, 286, 69 *L.Ed.* 543, 553 (1925)); *Henry, supra,* 133 *N.J.* at 110–12, 627 *A.*2d 125. In addition, under *N.J.S.A.* 40A:14–152.1, full-time police officers "have full power of arrest for any crime committed in [the] officer's presence and committed anywhere within the territorial limits of the State of New Jersey." That comports with the common law, under which "peace officers also had the authority to arrest without a warrant if they had probable cause to believe that a suspect was committing or had committed a felony," even if outside the officer's presence. *Henry, supra,* 133 *N.J.* at 110, 627 *A.*2d 125 (citing *State v. Doyle,* 42 *N.J.* 334, 345–46, 200 *A.*2d 606 (1964)); *see also N.J.S.A.* 40A:14–152 (empowering police officers to "apprehend and arrest any disorderly person or any person committing a breach of the peace" within view).

## IV.

We now analyze whether the actions of the police were reasonable under the Federal and State Constitutions. The proper focus of that inquiry is on the conduct of the officers and not their subjective intent. An action is reasonable "regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action. The officer's subjective motivation is irrelevant." *State v. O'Neal,* 190 *N.J.* 601, 613–14, 921 *A.*2d 1079 (2007) (quoting *Brigham City v. Stuart,* 547 *U.S.* 398, 404, 126 *S.Ct.* 1943, 1948, 164 *L.Ed.*2d 650, 658 (2006) (alteration in original) (internal quotation marks and citations omitted)); *see also State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983).

It is helpful to view the conduct of the police step by step. In connection with an ongoing investigation, they approached Brown's girlfriend's apartment building and knocked on the door to her apartment. They did not need a warrant to do so. *See State v. Domicz,* 188 *N.J.* 285, 302–03, 907 *A.*2d 395 (2006) (noting no unconstitutional intrusion when police approach part of building used by visitors to make contact with resident).

Brown's mother's phone call gave him advance notice that the police were outside the building. Of critical importance, the trial court found that Brown "fled out the back window ... [i]mmediately upon learning of police presence at Ms. Connor's apartment." Ample, credible evidence supports that finding. According to Detective Coffey, Brown fled when Connor opened the door and the police asked for him. Connor testified that Brown fled even earlier when the police knocked on the door.

Brown claims that his flight was caused by the police's illegal conduct and that they therefore still needed a warrant to arrest him. Based on the record, though, at the moment Brown fled, the police had engaged in no misconduct. They merely knocked on an apartment door and asked if Brown was present. There is no evidence or finding in the record that the police entered the

apartment before Brown fled onto the roof next door.[6]   Thus, there was no seizure of any sort in the apartment.

Beyond that, Brown's flight created a new reality.   By moving to a public place and creating a standoff there, Brown transformed the situation from an arrest in a third party's private apartment, where police would need an arrest and search warrant, to the public arena, where the police could arrest him without a warrant based on probable cause that he had committed armed robbery.   *See supra* at 138–39 n. 2, 14 *A.*3d at 29 n. 2.

In addition, Brown's conduct in the presence of the police provided an alternative basis to arrest him.   After jumping onto a roof, Brown created a twenty-minute standoff with the police in a public place, posing a risk to the officers and the public.   Because Brown resisted arrest in that way, the police had the authority to arrest him without a warrant for resisting.   *See N.J.S.A.* 40A:14–152.1 (authorizing warrantless arrests for crimes committed in presence of officer); *N.J.S.A.* 40A:14–152 (authorizing warrantless arrests for disorderly person or person committing breach of peace "upon view" of officer); *Henry, supra,* 133 *N.J.* at 110, 627 *A.*2d 125.   Indeed, soon after the standoff, the police charged Brown with resisting arrest, in violation of *N.J.S.A.* 2C:29–2, and a jury convicted him of fourth-degree resisting arrest.[7]

Because the police had probable cause to arrest Brown in public (1) for armed robbery committed outside their presence, and (2) for his behavior in resisting arrest, which they observed, they did

---

[6] Entry into the apartment by the police afterward does not alter those facts. Detective Coffey testified that when Brown jumped out the window, he believed one officer went into the apartment after him.   The police then promptly left the building.   In addition, the trial court found that Connor later voluntarily consented to a search of the apartment despite her testimony to the contrary.

[7] It is not a defense to a charge of resisting arrest or eluding that a "law enforcement officer was acting unlawfully in making the arrest, provided he was acting under color of his official authority" and had announced his intention to arrest.   *N.J.S.A.* 2C:29–2a.   A claim that an officer was *planning* to act unlawfully would fare no better under the statute.

not need an arrest warrant. As a result, the admittedly defective warrants the police possessed—which were tantamount to no warrants at all under the circumstances and rendered this a warrantless arrest, *see Groh v. Ramirez,* 540 *U.S.* 551, 558, 124 *S.Ct.* 1284, 1290, 157 *L.Ed.*2d 1068, 1079 (2004)—do not affect the outcome here.

To be sure, we do not sanction certain conduct by the police in this case. They presented robbery complaints that contain no evidence of probable cause specifically as to Brown; they acted on invalid arrest warrants that were neither reviewed nor signed by a detached court officer before they made an arrest; and they did not obtain a search warrant to arrest Brown in the home of a third party. Better police training would address some of those issues. Likewise, enhanced training of court officers who review complaints for probable cause might be warranted, which we call to the attention of the Director of the Administrative Office of the Courts. However, because Brown chose not to stand his ground in his girlfriend's apartment and submit to a warrantless arrest, and instead fled and engaged in a public standoff, the above issues do not surface in the final analysis of this case.

Police officers took Brown into custody after the standoff. They testified that they advised him of his *Miranda* rights multiple times, and he repeatedly waived them. Brown claimed otherwise, and the trial court found him not credible. There is substantial, credible evidence in the record to support the court's finding that Brown voluntarily waived his rights. *See State v. Robinson,* 200 *N.J.* 1, 15, 974 *A.*2d 1057 (2009); *State v. Locurto,* 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999). The trial judge also had substantial reasons to reject Brown's other arguments that he was not given food or drink and was subjected to endless questioning in a coercive manner. The statements he made while in police custody were therefore admissible at trial.

Because Brown's constitutional rights were not violated by his lawful arrest, it is not necessary to consider his attenuation argument or case law discussing the concept. The now familiar

doctrine calls for suppression of the fruits of an illegal arrest unless the chain of causation between the illegality and a later confession is so attenuated, or has been interrupted by some intervening circumstance, that the confession was "sufficiently an act of free will to purge the primary taint of the unlawful" conduct. *Wong Sun v. United States*, 371 *U.S.* 471, 486–88, 83 *S.Ct.* 407, 416–17, 9 *L.Ed.*2d 441, 454–55 (1963); *State v. Worlock*, 117 *N.J.* 596, 622, 569 *A.*2d 1314 (1990). However, before examining the fruits, courts must find that the proverbial tree was "poisonous." *See United States v. Crews*, 445 *U.S.* 463, 471, 100 *S.Ct.* 1244, 1250, 63 *L.Ed.*2d 537, 545 (1980) (noting "the [beginning] premise that the challenged evidence is in some sense the product of illegal governmental activity"). Because no taint flows from a lawful arrest, nothing about it needs to be purged. We therefore need not evaluate whether Brown's confession was sufficiently attenuated from his arrest.

One example helps demonstrate the point. Brown relies heavily on *State v. Johnson*, 118 *N.J.* 639, 573 *A.*2d 909 (1990). In that case, the Court excluded evidence of a defendant's escape and a telephone call he made after ten hours of police questioning that repeatedly and blatantly violated his constitutional rights. *Id.* at 648, 654, 573 *A.*2d 909. The Court ultimately concluded that "the State ha[d] not purged the evidence of the taint of its own illegal conduct." *Id.* at 659, 573 *A.*2d 909. Once again, Brown's statements were not the product of unlawful state conduct; the attenuation doctrine thus does not apply.

In light of the facts and disposition of this case, we do not need to decide whether to adopt *New York v. Harris*. In that case, the police arrested a defendant in his home, based on probable cause, without first getting an arrest warrant. 495 *U.S.* at 15, 110 *S.Ct.* at 1642, 109 *L.Ed.*2d at 19. The Supreme Court held that despite a *Payton* violation, the exclusionary rule did not bar the State from using defendant's post-arrest statement made outside of his home. *Id.* at 21, 110 *S.Ct.* at 1644–45, 109 *L.Ed.*2d at 22. Because

there was no *Payton* violation in this case, *New York v. Harris* is inapplicable.

## V.

For the reasons set forth above, we affirm and modify the judgment of the Appellate Division. The matter is remanded for resentencing consistent with the Appellate Division's opinion.

*For affirmance as modified and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, RIVERA-SOTO, HOENS and STERN (temporarily assigned)—6.

*Not Participating*—Justice LONG—1.

*Opposed*—None.

