**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5494-16

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DUPREE S. REYNOLDS,
a/k/a DUPREE PRATT, and
DU'PREE REYNOLDS,

     Defendant-Appellant.

_____

Argued September 23, 2020 – Decided September 28, 2021

Before Judges Ostrer, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 14-03-0782.

Molly O'Donnell Meng, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Molly O'Donnell Meng and Elizabeth C. Jarit, Deputy Public Defender II, of counsel and on the briefs).

Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent

(Jill S. Mayer, Acting Camden County Prosecutor, attorney; Jason Magid, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

A shooter in Camden City missed his target and struck a school bus carrying a group of small children. Evidence suggested that defendant Dupree S. Reynolds was one of the shooter's accomplices. So, early one morning, police surrounded Reynolds's ex-girlfriend's house, where Reynolds was babysitting his child. Reynolds tried to escape out a back window, but police spotted him and ordered him to open the door. When he complied, they ordered him out onto the porch and then arrested him on the sidewalk.

After receiving the ex-girlfriend's permission, the police searched her house and discovered Reynolds's cellphone, his jail ID, drugs and drug paraphernalia. Later, at a Federal Bureau of Investigation (FBI) office, Reynolds waived his Miranda[1] rights and made a statement implicating himself in the school bus shooting.

In due course, Reynolds sought unsuccessfully to suppress the statement and the physical evidence. After a bifurcated trial that presented the shooting-

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

related charges before the drug-related charges, a jury convicted Reynolds of: third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7), as a lesser-included offense of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count three); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (count five); third-degree possession of a rifle or a shotgun, N.J.S.A. 2C:39-5(c)(1) (count six); second-degree unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f) (count seven); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count eight). The jury acquitted Reynolds of: first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a)(1) (count two); and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count four). On Reynolds's motion, the court dismissed a charge of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count nine).

Then, pursuant to a plea agreement, Reynolds pleaded guilty to possession of a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3) (count twelve), and the court dismissed the following remaining drug charges: third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1) (counts eleven and fifteen); third-degree possession of CDS with an intent to distribute in a school zone, N.J.S.A. 2C:35-7 (count thirteen); and

3

second-degree possession of CDS with the intent to distribute near public property, N.J.S.A. 2C:35-5 and 2C:35-7.1 (count fourteen).

Reynolds now appeals from his convictions, challenging the court's pre-trial orders and asserting various trial errors. He also appeals from his sentence, arguing the trial court misapplied his jail credits. Having carefully considered Reynolds's arguments in light of the factual record and applicable law, we affirm his convictions and sentence, but remand for the trial court to clarify the judgment of conviction's explanation of jail-credits.

I.

Reynolds moved to suppress his post-arrest statement and physical evidence seized in his ex-girlfriend Shaquan Mack's home, contending they both were the fruit of an unlawful arrest.[2] During the suppression hearing, Camden County Police Lieutenant William Wiley detailed the circumstances of Reynolds's arrest. According to Wiley, police went to Mack's home because they had "a municipal warrant or a traffic warrant for . . . Reynolds, and [they] knew that the detectives needed to speak to him in reference to the shooting

---

[2] The court had previously found, after a <u>Miranda</u> hearing, that once Reynolds was in custody, he voluntarily, knowingly and intelligently gave his statement after receiving appropriate warnings. Defendant does not challenge that ruling.

case."[3]  After they arrived at about 6:30 a.m., some of the team remained in front of the house, while two others waited at the back.  Wiley was on the front porch. He knocked on the door, and "heard movement" for "quite a bit of time."  Then, one of the detectives at the back reported that Reynolds was trying to escape through a back window, but "that they told him to go back inside and answer the door."

Wiley and his fellow officers then "backed off the porch and moved to a more secure area" "to take cover" because "there was a possibility that there was a military-style rifle inside the residence," and to enable them "to cover the upstairs windows in the front."  After that, "the door opened and a black male and a black female came out of the residence.  The male, . . . Reynolds, was instructed to come down off the porch with his hands up," and after he reached the sidewalk, "he was handcuffed and placed in a patrol car."

The police "were [also] looking for [Reynolds's] cell phone for evidence." After Mack invited them in and told them where to find the phone, they seized it.  They then sought her formal written consent to search the house.  Wiley read aloud, and Mack signed, a "Consent to Search/Seize form," which informed her

---

[3]  Reynolds lived with his mother, not Mack, but he was at Mack's home that morning to babysit his child.

A-5494-16

of her "right to refuse consent" and her right to "stop the search at any time once it's begun." An officer remained with Mack during the search and would have notified Wiley "if [Mack] decided to exercise her right to terminate the search." Mack did not terminate the search; in fact, during the encounter, "[s]he was cooperating" "because she had small kids who could have been on that bus."

While searching, the police found CDS and related materials in the room in which they found Reynolds's cell phone. At some point, they found Reynolds's Camden County Jail ID in that same room.

During the suppression hearing, Reynolds testified about the circumstances of his arrest:

> The police officers came to my home. When I went to open the door, I had my son in my hand, I came out the front door.
>
> He made me sit on the top step, asked me who else was in the house. I told him my child mother and her friend. He said okay. He get up and announced, said, 'Police, Come out now with your hands up.'
>
> He — my baby mom, Shaquan Mack, came down the steps. He asked her to take my son into her hand and then a cop said, wait a minute, pull her to the side. . . . [T]he cops put the handcuffs on me and put me in the patrol car.
>
> He never told me or never showed me any arrest warrant, any municipal warrant, nothing. I was put in that patrol car and they pulled off with me. After that, I don't know what happened, who went in or what happened after that.

6

He later said that as he exited the door, the police "had guns drawn." He contended, "If somebody got a gun pointed towards you with your child in your hand and he said come out the house, what are you gonna do? You're gonna come."

After it emerged that no valid warrants existed on the day Wiley arrested Reynolds, the State recalled Wiley to establish probable cause to arrest Reynolds without a warrant. Wiley explained that he was "continuously involved in this investigation" from the shooting until the arrest. A surveillance video and the location of casings linked the shooter with a certain car. Wiley found the owner of the shooter's car, Tenielle Fenderson, who told Wiley that although "she was the registered owner, . . . the vehicle belonged to [Reynolds's co-defendant] Frank Benson." She also said that Benson had the vehicle on the day of the shooting, September 12, 2013, but scrapped it shortly thereafter.

Wiley located Benson and "t[ook] him to be formally interviewed." The detective who conducted the interview told Wiley that "[Benson] admitted that the vehicle was involved or he believed that the vehicle was involved. He . . . stated that . . . Reynolds and Sinclair [Reynolds, defendant's brother] had contacted him about retaliating against a male who apparently robbed Sinclair

7

the day before" the shooting.[4]  "Benson further stated that he had talked to Dupree Reynolds that day by . . . cell phone and that . . . Reynolds asked to borrow the vehicle, and . . . he said he lent him the vehicle."

Upon searching Benson's phone, police found "a text message between Dupree [Reynolds] and Frank [Benson] basically confirming what Frank [Benson] had said about . . . someone being identified or being at a location that had robbed Sinclair the day before."  And another individual, James Macklin, told a detective that according to Benson, "Reynolds called [Benson] to come over and bring the car so they can retaliate against this person that robbed him." Before arresting Reynolds, Wiley knew about the text message and Macklin's information.

Pursuant to communications data warrants (CDWs) that Wiley secured for Benson's and Reynolds's phones, Wiley obtained information that would enable an expert to pinpoint the phones' physical locations.  Wiley provided the data to FBI Special Agent William Shute, "the technical, electronic surveillance guy for the FBI," and later learned that "[b]oth phones were in the area" of the shooting.

---

[4]  Because Reynolds and his brother Sinclair share the same surname, for convenience we refer to Reynolds's brother by his first name, and mean no disrespect in doing so.

The court denied the motion to suppress (and a motion to dismiss). In a lengthy fact-finding, the judge found that the officers arrested Reynolds on the porch, and, therefore, "a warrantless arrest could have been made . . . if it was supported by probable cause"; she concluded that "based on the totality of [the] circumstances, . . . the police had probable cause to conduct a warrantless arrest of the defendant." The judge stated:

> Certainly, had the officers passed over the threshold . . . and entered the home to arrest the defendant, they would have been acting outside of the authority and the arrest would have been unlawful since there was no valid arrest warrant . . . .
> The fact that the police officers requested the defendant to step outside of the residence does not change the outcome. Physical entry of a home is a chief evil against . . . the wording of the Fourth Amendment. . . . For those reasons, I find . . . that the arrest . . . was lawfully conducted pursuant to probable cause.

The judge also found "that the officer secured valid consent to enter [the home] from . . . the homeowner. Lieutenant Wiley testified that he explained to Ms. Mack that she had the right to refuse consent," and "that an officer remained with Ms. Mack in the event that she wished to terminate the search. He further testified that Ms. Mack's demeanor was very cooperative during the officer's investigation." The judge found, too, "that defendant had no common authority over the rear bedroom and cell phone, as well as the controlled dangerous

9

substance . . . , and that Ms. Mack validly consented to a search of that room as the homeowner," where defendant "testified that he lived with his mother and that he would only visit with Ms. Mack for the purposes of babysitting."

At the subsequent trial,[5] several additional witnesses testified, including Fenderson and Benson. Fenderson testified that Benson was the de facto owner of her car, and that "sometime prior to the middle of September" (that is, within a few days after the shooting), Benson asked her to sign paperwork to have the car "junk[ed]."

Benson testified that Reynolds texted him on the day of the shooting, asking him to meet him "[be]cause he had a situation between . . . his brother and somebody else." Benson picked up Reynolds and Sinclair in Fenderson's car. At some point, all of them got out of the car; when they returned, Sinclair was carrying a bag more than two feet long, but Benson did not see the bag's contents. Afterwards, Benson drove the car, with Reynolds on the passenger side and Sinclair in the back seat. When they reached their destination, Sinclair left the car, but not before Benson saw the firearm, which Sinclair removed from

---

[5]  Reynolds's trial was severed from that of his co-defendants, Benson and Sinclair. Two years before Reynolds's trial, Benson pleaded guilty to one count of second-degree aggravated assault, and was sentenced to a five-year term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Sinclair was acquitted after a trial following his brother's trial.

A-5494-16

the bag. It was silver, and Benson, who "had previous dealings with weapons," was "pretty much sure" that the weapon was an AK-47. Benson then heard about seven loud shots.

In less than a minute, Sinclair returned to the car. Benson then dropped the brothers off; Sinclair took the bag. Within a day or two, Benson had Fenderson "sign off for [the car] for them to take it away." On cross-examination, he testified that he believed they were going to the park to "scare," not to "confront," Sinclair's adversary. He agreed that when he brought them to the park, he thought he was "helping [Reynolds] and Sinclair to get back to this guy for robbing Sinclair." But he confirmed that he "knew that Sinclair was going to take out an AK-47 and shoot it." He later clarified that he knew Sinclair was going to pull out the gun, but "didn't think he was going to use it." However, he eventually (and inconsistently) stated that he "didn't know [Sinclair] had the gun until [they were] at the park."

After Benson's testimony, defense counsel and the prosecutor noted that they had agreed upon a redacted version of Reynolds's statement for presentation to the jury. The State then played a recording of the statement.

During Reynolds's lengthy, tense interview, FBI Special Agent Jake Archer presented him with phone records to demonstrate he was near the scene

11

of the shooting. Reynolds reluctantly admitted that Sinclair reported that Donte Brown had robbed him; and, shortly thereafter, Reynolds, Sinclair, and Benson "drove off" together in search of Brown. When Benson pulled over, Sinclair "jumped out," and Reynolds "heard the shots going off," "[a]t least like seven or eight." Reynolds said that their intention was "to jump" Brown, and that "after the second shot [went] off," he "exited the vehicle," but he "got back in because [his] brother got back in"; and that the three of them left together in Benson's car.

Although the statement was redacted by agreement of defense counsel and the State, those portions played for the jury included several arguably prejudicial remarks. Some reflected Reynolds's previous contacts with the criminal justice system and the criminal milieu. For example, when Detective Luis Sanchez, one of the interrogating officers, asked Reynolds where he was on the day of the shooting, Reynolds responded, "I'm trying to think. Friday, I had got locked up. Before that, I have to think." Also, when Sanchez commented, "I understand that you're afraid maybe of . . . your brother," Reynolds told him that "being scared is the last thing of my worries" because he had previously been stabbed, a wound which had caused his intestines to come out and required fifty-four stitches. In addition, after Sanchez said, "I've seen it all: stabbings, murders,

A-5494-16

everything. And, unfortunately, that's the sad reality of growing up in the City," Reynolds said, "Raised into it; hard to get out of it." Defense counsel also permitted the jury to hear Reynolds's interrogators repeatedly accuse him of lying.

After the jury heard most of the statement, defense counsel asked "for a cautionary instruction regarding the statement." The court, before agreeing to deliver a cautionary instruction (after the statement), responded:

> [T]he two of you placed on the record that you had redaction agreements. The first part of the statement, it talks about, I was locked up. How you missed that when you were redacting the statement, and the two of you looked at it, that's something that . . . I would have [sic] allowed to come into the jury. The part about him being stabbed. He was locked up. I would not have allowed it.

The judge later added that she would not have allowed the portion "when the Officer is saying, 'Stop, stop, you're lying,'" because "[t]hat was more opinion testimony from a witness."

While discussing the actual instruction, the judge asked defense counsel "if you want to highlight the part about him being locked up or stabbed"; defense counsel agreed that steering clear of those remarks was the wiser course. Thus, when the statement came to an end, the judge provided this instruction:

13

> Now the evidence in this matter is only what comes directly from Mr. Reynolds. The comments by the Detective are not evidence. They're not to be considered by you for the truth of what was said, but they are only to be considered by you as statements made to further the investigation.

After the statement, Wiley testified about the arrest and the phone records; in addition, he discussed firearms. Wiley stated that he had personally investigated "probably . . . more than a couple of hundred" cases involving firearms; he also agreed that "based on [his] training and experience," he could "determine the type of weapon . . . used based upon shell casings that are left behind."

Defense counsel objected to this line of questioning, pointing out that Wiley was not an expert witness. The court, however, decided that "if it's in his experience," such a determination was merely "[a] layman's testimony." When the prosecutor subsequently presented Wiley with a casing, he identified it as one that would "[g]enerally" "be in a high[-]power rifle, an assault weapon, military style weapon," such as an AK-47. Wiley had previously seen the casings at the scene of the crime.

After Wiley completed his testimony, Shute was qualified to testify "as an expert in the field of historical cell site analysis." At that point — that is, between Wiley's and Shute's testimony — the court gave an expert witness

14

charge. Shute then opined that Reynolds's phone "had to pass within . . . three, 400 yards" of the crime scene "during the time or before and after the crime."

The court's final jury instructions included an expert witness charge; the court also instructed the jurors that "[t]he comments by the detective[s] are not evidence. Therefore, they are not to be considered by you for the truth of what was said, but they are only to be considered by you as statements made to further the investigation."

During deliberations, the jury heard Benson's testimony replayed twice, and Reynolds's statement replayed once. During the latter replay, the jury again heard that Reynolds had been "[r]aised into" violence, locked up, and stabbed, and it heard the interrogators repeatedly call him a liar.

The jury eventually reached a unanimous verdict, convicting Reynolds on some counts but acquitting him on others, as we have previously noted.

Reynolds thereafter entered a plea to count twelve, possession of CDS with the intent to distribute, to resolve the severed drug counts; in return, the State agreed to recommend a four-year flat term. The parties ultimately agreed the four-year term would run consecutive to the sentence on count seven, the assault firearms charge, and concurrent to the sentence on the other counts.

15

At sentencing, the court found "the aggravating factors clearly, convincingly and substantially outweigh[ed] the mitigating factors."[6] The court imposed a ten-year term, with a ten-year period of parole ineligibility on count eight, possession of a firearm for an unlawful purpose, after merging the aggravated assault convictions under counts three and five. That ten-year sentence was to run concurrent with an aggregate eleven-year sentence consisting of: (1) a seven-year term, with a three-year period of parole ineligibility on count seven, unlawful possession of an assault firearm, after merging count six, unlawful possession of a weapon; and (2) a four-year flat term on count twelve, the drug charge, which would also run concurrent with a violation of probation.[7]

---

[6] The court found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("risk . . . defendant will commit another offense), based on his repeated prior offenses; aggravating factor six, N.J.S.A. 2C:44-1(a)(6) ("extent of . . . defendant's prior criminal record and the seriousness of the offenses of which [he] has been convicted"), based on his prior convictions; and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter "defendant and others from violating the law"). Based on Reynolds's behavior since his incarceration pending trial, the court found mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) ("The character and attitude of . . . defendant indicate that [he] is unlikely to commit another offense.").

[7] The judge said the four-year sentence would run consecutive to the seven-year sentence, but she also said the seven-year sentence would run consecutive to the four year-sentence. The judgment of conviction does so as well.

A-5494-16

The court explained that jail credits would not apply to the four-year term, because they were "all going towards the sentence that's being r[u]n concurrent." The court added, "As it's a consecutive sentence, you would not get any credits on the front end, but he'll get credits on the back end. The judgment of conviction clarified that no jail credits were applied to the four-year sentence, stating "no jail credits are awarded towards severed counts." (All-caps removed).

On appeal, Reynolds raises the following points:

POINT I

THE TRIAL COURT ERRED IN FAILING TO SUPRESS THE PHYSICAL EVIDENCE SEIZED AND THE STATEMENT GIVEN AFTER POLICE UNLAWFULLY ORDERED ALL OCCUPANTS OUT OF THE HOME AND ARRESTED DEFENDANT WITHOUT A WARRANT.

[A.] Police Acted Unlawfully by Ordering Defendant to Exit the Home at Gunpoint and Arresting Him Without a Warrant.

[B.] The Warrantless Search Was Invalid Because Ms. Mack's Consent Was Coerced.

[C.] Conclusion.

POINT II

THE STATE FAILED TO PROVE THAT THERE WAS A VICTIM, REQUIRING AN ENTRY OF A

17 A-5494-16

JUDGMENT OF ACQUITTAL ON THE CONVICTIONS FOR AGGRAVATED ASSAULT AND POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE.  (Not raised below).

POINT III

DEFENDANT WAS DENIED A FAIR TRIAL WHEN HIS TAPE-RECORDED STATEMENT WAS NOT REDACTED TO OMIT REFERENCES TO HIS PREVIOUS INCARCERATION AND OFFICERS' REPEATED COMMENTARY THAT DEFENDANT WAS LYING.  (Not raised below).

A. The Statement Played for The Jury Contained Improper Prior Bad Acts Evidence.

B. The Statement Played for The Jury Also Contained Improper Statements by the Detectives Disparaging the Defense.

C. The Improper Redactions Were Plain Error and Denied Defendant His Right to a Fair Trial.

POINT IV

THE TRIAL COURT'S FAILURE TO PROVIDE THE JURY WITH AN EXPERT JURY INSTRUCTION WITH RESPECT TO DETECTIVE WILEY'S BALLISTICS TESTIMONY REQUIRES REVERSAL. (Not raised below).

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED DEFENDANT A FAIR TRIAL.  (Not [r]aised [b]elow).

A-5494-16

POINT VI

THE JUDGMENT OF CONVICTION SHOULD BE
AMENDED TO REFLECT THAT JAIL CREDITS
APPLY TO THE SENTENCE ON COUNT TWELVE.
(Not [r]aised [b]elow).

II.

Only one issue warrants extended discussion. Reynolds argues that the police unlawfully arrested him, or at least seized him, when they instructed him to answer the door (or, at the very least, when they ordered him to exit the house). He contends that ordering him to step outside where he was arrested was no different than entering the home to effectuate an arrest. He contends that his later statement was the product of that unlawful arrest and should be suppressed. We are unpersuaded.

We defer to the trial court's factual findings if "sufficient credible evidence in the record" supports them. State v. Lamb, 218 N.J. 300, 313 (2014). However, we review de novo issues of law, including the legal consequences that flow from established facts. Ibid. Applying that standard of review, we reject Reynolds's argument that police arrested him unlawfully.

We recognize — and the State concedes — that barring exigent circumstances or consent, police lacked authority to enter Mack's home to arrest Reynolds; although they had probable cause (Reynolds does not dispute that),

19

they lacked the requisite warrants to arrest him and to enter Mack's home.  See State v. Brown, 205 N.J. 133, 145 (2011) (stating that "[a]bsent exigent circumstances or consent," the police must obtain an arrest warrant and a search warrant to arrest a person in a third-party's home).  That is because "home intrusions are the 'chief evil' against which" the Fourth Amendment and Article 1, Paragraph 7 of our State Constitution are directed.  State v. Walker, 213 N.J. 281, 289 (2013) (quoting United States v. U.S. Dist. Ct., 407 U.S. 297, 313 (1972)); see also Payton v. New York, 445 U.S. 573, 589-90, 601 (1980) (holding that the Fourth Amendment bars warrantless arrests inside the home (absent a warrant exception), and noting "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic").

However, police may conduct a warrantless felony arrest supported by probable cause in a public place.  Brown, 205 N.J. at 145.  That includes an arrest effectuated after a suspect leaves the sanctuary of a home to flee police who approached the house and knocked on the door.  Id. at 146-47.

In Brown, as here, police knocked on the front door of the defendant's girlfriend's house, armed with what turned out to be invalid arrest warrants.  Id. at 139.  But, unlike here, the defendant succeeded in fleeing out the back window

A-5494-16

onto a nearby roof.  Id. at 140.  After a standoff with police, the defendant was arrested.  Ibid.  The Court held that police did not need a warrant to knock on the door, id. at 146, and they lawfully arrested the defendant without a warrant in a public place, based on probable cause, id. at 147.

Had the police let Reynolds complete his exit from the second-floor window, they would have been empowered to arrest him, just as the police were empowered to arrest Brown.  Reynolds contends it makes all the difference in the world that police arrested him after he exited the front door in response to the police's direction.  We disagree.

The "touchstone" of Fourth Amendment jurisprudence is reasonableness. State v. Handy, 206 N.J. 39, 48 (2011) (quoting United States v. Ramirez, 523 U.S. 65, 71 (1998)).  It would be unreasonable to hold that police are obliged to risk a suspect's safety and their own by waiting until a fleeing suspect completes his jump from a second-floor window to a public place before effectuating an arrest.  The police directed Reynolds to exit from the door instead of waiting for him to complete his exit from the window.  Under those circumstances, police did not invade "the sanctity of the home."  Rather, Reynolds surrendered it when

he tried to escape. The police simply transferred Reynolds's point of exit. Therefore, his arrest was lawful, as an arrest in a public place.[8]

Even if police effectuated Reynolds's arrest unlawfully, the State argues that Reynolds's subsequent statement was not a product of the illegality — the unlawful "entry" into the home — and therefore should not be suppressed.

No doubt, our decision in State v. Bell, 388 N.J. Super. 629 (App. Div. 2006), which relied on New York v. Harris, 495 U.S. 14 (1990), lends support for that view. In Harris, the Court held that a suspect's post-arrest custodial statement was admissible, notwithstanding that police unlawfully entered the suspect's home to arrest him; because police had probable cause to arrest, the statement was "not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home rather than someplace else." 495 U.S. at 18-19. Similarly, in Bell, the police unlawfully effectuated an arrest in a third-party's home without a search warrant (although police possessed a valid arrest warrant). 388 N.J. Super. at 631-32. We held, "As in Harris, nothing in

---

[8] Given our analysis, we need not address whether the arrest would have been lawful under Payton had Reynolds not tried to flee, and the police simply ordered Reynolds to exit the home, instead of entering the home to effectuate an arrest. We also need not address whether police would have been justified by exigent circumstances to enter the home. See State v. Hutchins, 116 N.J. 457, 462-73 (1989) (discussing basis for exigent warrantless entry into a home to effectuate an arrest).

the circumstances of [the] defendant's arrest or confession suggests that the confession was the 'product' of his having been arrested inside his aunt's house rather than on the street." Id. at 638. Therefore, under the exclusionary rule, there was no basis to suppress the defendant's subsequent statement. Ibid.

We recognize that Harris (and by implication, Bell), has been subject to criticism, including that of the four dissenters, see Harris, 495 U.S. at 21 (5-4 decision) (Marshall, J., dissenting); the court of the state from which Harris originated, see People v. Harris, 570 N.E.2d 1051, 1052-54 (N.Y. 1991) (concluding that New York's Constitution requires the suppression of statements taken from an accused who was unlawfully arrested in a home, absent attenuation); and other courts, see, e.g., State v. Geisler, 610 A.2d 1225, 1232-33 (Conn. 1992) (declining to follow Harris under Connecticut's constitution).

In Brown, our Supreme Court declined to decide whether to reject Harris under our State's Constitution and require suppression of statements taken from persons unlawfully arrested in a home. 205 N.J. at 149. The Court did not need to reach the issue once it determined that Brown was arrested in public. Id. at 149-50. For similar reasons, we decline to revisit the issue. Rather, we affirm the court's order denying the suppression of Reynolds's statement because his arrest did not violate the sanctity of Mack's home.

23

III.

Defendant's remaining arguments require only brief discussion.

A.

We reject Reynolds's argument that the warrantless search of Mack's home lacked her knowing and voluntary consent. Consent to search is "an accepted exception to the warrant requirement." State v. Coles, 218 N.J. 322, 337 (2014). The State must "prov[e] that proper consent was given freely and voluntarily," id. at 338, after the consenting individual became "aware of [his or] her right to refuse," see State v. Hagans, 233 N.J. 30, 39 (2018).

"[W]e uphold the trial court's factual finding[]" that Mack validly consented to the search because "sufficient credible evidence in the record" supports this finding. Id. at 37 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). The court credited Wiley's testimony that he informed Mack of her right to refuse, that an officer remained with her should she wish to stop the search, and that she was "very cooperative during the . . . investigation." Mack's subsequent written consent was further evidence that she acted voluntarily. In sum, there was sufficient credible evidence in the record to support the court's conclusion that Mack voluntarily consented to the search.

B.

We discern no merit in Reynolds's newly-minted argument that the State failed to prove there was a victim of the aggravated assault and possession of a weapon for an unlawful purpose. We recognize that proof of an aggravated assault requires proof of actual or intended injury to "another." See N.J.S.A. 2C:12-1(a)(1), -1(b)(4), -1(b)(7). Reynolds's argument that the State failed to present evidence that Brown was a victim is belied by the evidence. In his custodial statement, Reynolds said that he, Sinclair, and Benson went to the park to confront Brown; and Sinclair and Benson "already knew he was over there" when Benson stopped his car. That alone provided sufficient evidence for the jury to infer that Brown was in the park at the time of the shooting and that he was the intended victim. It also is of no moment that, in the trial against Sinclair, the trial court dismissed similar charges based on the absence of proof of a victim. Reynolds's statement was not admitted into evidence in that trial.

C.

Next, we address Reynolds's contention that improper redaction of his statement denied him a fair trial. Reynolds argues that the jurors were unable to evaluate his statement impartially because unduly prejudicial remarks peppered the statement. Specifically, the jury heard that Reynolds had been

25

raised into a culture of violence, locked up, and stabbed, and it heard his interrogators repeatedly call him a liar. Reynolds argues not only that counsel erred in failing to redact the remarks, but also that the trial judge erred in failing to ensure that the remarks (which the judge heard during the body of the trial) were redacted before the jury-requested playback.

Generally, we do not reverse a conviction if the defense counsel "induced, encouraged or acquiesced in or consented to" a given error (in other words, if defense counsel invited the error). State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). Here, defense counsel agreed to use a "redacted" version that included these arguably prejudicial remarks; she did not ask the court to provide a curative instruction for anything except the officers' accusations; and she failed to ask the court to redact any of the remarks before the jury-requested playback. Thus, she "induced" or "acquiesced in" the initial admission of the remarks, as well as their reappearance in the playback. If the admission of such remarks was error, it was invited error.

And even if we assume that the trial court erred in failing to sua sponte redact the remarks before the playback, such an error was not "clearly capable of producing an unjust result." See R. 2:10-2. Of Reynolds's remarks, the only

26

one that truly creates an inference of unlawful propensities was his reference to being locked up. As for the others, his reference to being stabbed paints him as a victim, not a perpetrator, of a crime, and his comment about being raised into a difficult-to-escape culture of crime may suggest that he was a victim of circumstance. In any event, the sheer length of Reynolds's statement negates the effect of these fleeting remarks, despite the fact that the jury heard them twice.

And the inclusion of the officers' accusations was not error. We recently held that "the trial judge's failure to sanitize portions of [a defendant's] recorded statement where [a detective] told [the] defendant that he did not believe [the] defendant's account" was not "tantamount to the officers testifying that they did not believe him." State v. Howard-French, ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 19). We held that the detective's "questioning of the veracity of [the] defendant's account . . . was a legitimate exercise of police authority and allowing the jury to hear it provided context to the interrogation"; furthermore, "[t]he statements were not offered to persuade the jury that [the] defendant was lying," and "[t]he judge made it clear to the jury that it was obligated to determine the credibility of the witnesses and the statements admitted into evidence." Id. at 20. There, as here, the "[d]efendant has not shown there is

anything in the record suggesting the jury relied on the detective's comments or that redaction of them would have changed the outcome of the trial." Ibid. True, in this case, the accusations were far more vehement than those in Howard-French. See id. at 9-10. But the same reasoning applies.

Furthermore, the court delivered a clear, curative instruction on the subject. We presume the jury followed it. State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019).

In sum, we reject Reynolds's argument that the failure to redact his statement entitles him to a new trial.

D.

We also reject Reynolds's contention that the trial court committed plain error by omitting an expert charge regarding Wiley's ballistics testimony. Reynolds argues that Wiley's testimony was key to connecting Reynolds with the assault weapon, but, because Wiley's testimony went beyond the ken of the average juror, the jury could not adequately evaluate it without an expert charge.

"Plain error in the context of a jury charge . . . [must be] 'sufficiently grievous . . . to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Torres, 183 N.J. 554, 564

(2005) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).  We discern no such error here.

We have no doubt that Wiley's testimony was in the nature of an expert opinion.  His statement identifying the shell casings as those of an AK-47 assault rifle was based on his training and experience, not his senses, perceptions, and observations.  See State v. Hyman, 451 N.J. Super. 429, 442-43, 448-49 (App. Div. 2017) (distinguishing between lay testimony and expert opinion testimony).  However, as in Hyman, where an officer's opinion was improperly admitted as a lay opinion, the court's failure to qualify Wiley as an expert and to deliver an expert charge lacked a "clear capacity to bring about an unjust result."  Id. at 457.  That is because, as in Hyman, Wiley's qualifications as an expert were reviewed in detail, see id. at 458; the jury heard the expert charge regarding other witnesses, see id. at 456; and the court's "general charge on credibility invited the jury to consider [Wiley's] background, by instructing the jury to consider a witness's 'means of obtaining knowledge of the facts,' 'power of discernment,' and 'ability to . . . observe,'" see id. at 457 (second alteration in original).  Furthermore, the jury heard Benson identify the firearm Sinclair carried as an AK-47.

In sum, the omission of an expert instruction was not capable of bringing about an unjust result.

IV.

Lastly, we reject Reynolds's argument that his 1,322 days of jail credit should have been applied to the four-year flat sentence that the court imposed on count twelve, the drug charge. Here, the four-year term was consecutive to the seven-year term with a three-year parole ineligibility period imposed on count seven, possession of an assault firearm. Thus, Reynolds received an "aggregate sentence" of eleven years for those two counts. See State v. Hernandez, 208 N.J. 24, 38 (2011) (stating that an "aggregate sentence" equals the sum of multiple terms ordered to be served consecutively), overruled in part on other grounds, State v. C.H., 228 N.J. 111 (2017). That eleven-year aggregate term was concurrent with the ten-year term imposed on count eight, possession of a firearm for an unlawful purpose.

"If multiple charges are embodied in a single indictment and two or more counts are disposed of, the total amount of jail credits reduces the aggregate custodial sentence imposed." Id. at 47-48 (emphasis added). Thus, the court properly applied the 1,322 days to the aggregate eleven years on counts seven

and twelve, rather than, as Reynolds contends, reducing each component by 1,322 days.

The Court's decision in C.H. does not compel a different result. The trial court in that case sentenced the defendant to an aggregate ten-year-term with an eighty-five-percent parole ineligibility term on one indictment, and an aggregate four-year term on a second indictment, to be served consecutively. C.H., 228 N.J. at 114-15. The Supreme Court held that the trial court properly applied the jail credits only against the ten-year term, and the trial court refused to apply to each sentence the jail credits earned while the defendant was in custody awaiting trial on both indictments. Id. at 121, 123. The Supreme Court limited Hernandez to the extent it had been interpreted to require such double credits. C.H., 228 N.J. at 123. However, the Court reaffirmed the principle that jail credit shall be applied "to the front end of the aggregate sentence." Id. at 121-22. That rule applies when the aggregate sentence results from the sum of consecutive sentences from two separate indictments, as in C.H., or from the sum of consecutive sentences for separate counts of a single indictment, as here.

We acknowledge that the judgment of conviction also states that "no jail credits are awarded towards severed counts." (All caps removed). That statement is correct if it was meant to explain how the court treated count twelve,

the severed count; but it was incorrect if it was meant to express a general rule. Just as jail credits do not depend on "the prosecutor's joinder practice," Hernandez, 208 N.J. at 47, they do not depend on the severance of counts and their order of trial. The court should amend the judgment of conviction to delete that explanation.

We have also noted that the court's sentencing decision and the judgment of conviction do not clearly state that the flat four-year term on count twelve was to follow the seven-year term on count seven, and not the other way around. The judgment of conviction shall clarify what we believe was the court's intention that the four-year term follow the seven-year term, particularly inasmuch as the latter includes a period of parole ineligibility.

To the extent not addressed, Reynolds's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed as to the convictions and sentence; remanded to correct the judgment of conviction. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32                                                    A-5494-16